UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

CHANDLER BROOKS,

     Plaintiff,

v.

     No. 1:20-CV-049-H

TAYLOR COUNTY, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

Chandler Brooks was robbed and beaten in his hotel room in Abilene, Texas in March 2018. The attack left him unconscious and bleeding from his head—his skull fractured and his brain swelling. This lawsuit stems from what transpired over the next nine days. Brooks alleges that individuals from various law-enforcement organizations, both in their official and personal capacities, violated his constitutional rights when they failed to recognize and treat his serious brain injuries during his detention at the Taylor County jail. A number of defendants whom Brooks sued in their individual capacities moved for summary judgment, arguing that they are protected from Brooks's suit by the doctrine of qualified immunity. This opinion resolves that question.

The Court's opinion details the facts and conclusions as to each claim against each defendant—and there are many. In short, the Court concludes that most of the defendants are entitled to qualified immunity as to Brooks's claims. A reasonable fact finder could, however, find that six of the defendants violated Brooks's clearly established constitutional rights: Defendants Cronk, Elrod, Smurphat, and Spells are not entitled to qualified immunity as to Brooks's excessive-force claim, and defendants Cronk, Noret, and Vargas are not entitled to qualified immunity as to Brooks's deliberate-indifference claim.

1.     **Brooks's Assault, Arrest, and Confinement**

In the early afternoon of March 5, 2018, the Abilene Police Department received a call from the staff of the Motel 6 on West Stamford Street: one of the guests had failed to depart by check-out time, and management wanted him gone.  Dkt. No. 54 at 56.  When Officers Randall Farmer and Stan Meiser responded to remove the tardy guest, they discovered an incoherent, semiconscious Chandler Brooks.  *Id.*  The officers believed Brooks was intoxicated.  *Id.*  After their attempts to persuade Brooks to leave failed, Farmer and Meiser arrested him for criminal trespass.  *Id.*

The officers transported Brooks to the Taylor County Adult Detention Center[1] for processing and detention.  *Id.*  Before the trio arrived, jail staff were notified that Farmer and Meiser were en route with an unidentified and combative subject.  *Id.* at 7.  Farmer, Meiser, and Brooks arrived at the jail sometime around 2:02 p.m. on March 5, 2018.  Dkt. No. 54 at 20.  Reports from officers present at his arrival indicate that Brooks was uncommunicative, though the reports differ as to whether Brooks could not or simply would not communicate with officers.  *Compare* Dkt. No. 54 at 59 ("was not able") *with id.* at 66 ("would not communicate").  But a preliminary medical screening by defendant Alannah Grogan, the jail's duty nurse, indicated that Brooks did not need further evaluation or treatment before the jail accepted him for detention.  *Id.* at 7, 78.  And despite Brooks's silence in response to routine booking questions, an officer, defendant Mike Horton, used Brooks's tattoos to successfully identify him.  *Id.* at 59.

Knowing that Brooks was not experiencing an immediate medical emergency and now knowing his name, defendant Brandon Smurphat attempted to complete the jail's

---

[1] For brevity, the Court refers to it as "the jail."  *See also, e.g.*, Dkt. No. 54 at 7 (doing the same).

routine intake questionnaire. *Id.* at 99. "Based on [Brooks's] refusal to communicate and not knowing his intentions of possible self-harm to himself or possible harm to others," the officers placed Brooks in an ERC—an Emergency Restraint Chair—at 2:25 p.m. "until he was capable and willing to communicate with jail staff and be fully booked into the facility." *Id.* at 109.

He remained in the ERC for nearly twenty-three hours. *Id.* During that time, Brooks asserts that no one took his vital signs, no one provided medical care, no one offered food or water, no one offered him the opportunity to use the bathroom, and no one afforded him the chance to stretch. *Id.* at 37. But Floor Observation Logs from between 2:30 a.m. and 11:00 a.m. on March 6 detail 50 observations by various officers, with the longest period between observations being just fourteen minutes. Dkt. No. 54 at 136–37. According to the Logs, Brooks's vital signs were taken at least once, he refused to stretch on three occasions, and he was given a cup of water once. *Id.*

Eventually, at 1:20 p.m. on March 6, Brooks was removed from the ERC. *Id.* at 109. Defendant Cleston Cronk attempted to communicate with Brooks but was unsuccessful: "Brooks answers a few questions and falls asleep." *Id.* at 13. At 1:34 p.m., Cronk decided to place Brooks "in [a] holding cell until he [was] alert enough to be booked." *Id.*

The next day, March 7, Brooks was still incapable of completing a sentence when interacting with officers. *Id.* at 11. Over the course of that day, Brooks repeatedly rattled the bars of his cell. *Id.* at 11, 115. After persisting despite instructions to stop, Brooks was placed back in the ERC at 6 p.m. on March 7. *Id.* at 11, 115. He remained there for nearly seven hours, until almost 1:00 a.m. on March 8. *Id.* at 116. As with his first confinement in

the ERC, Brooks alleges that he did not receive food, water, medical care, or the opportunity to relieve himself or stretch. *Id.* at 38.

At 9:20 a.m. on March 8, Mary Brooks—the plaintiff's mother—arrived at the jail to see her son. *Id.* at 44–45, 69. When she arrived, she spoke with defendant Terrie Noret— the two were lifelong friends. *Id.* at 44, 89. Noret told Mary that her son had taken some bad drugs and that she would not want to see him in his then-present state. *Id.* at 44. Mary initially listened to her friend and left the jail. *Id.* at 45. But after driving a few miles, Mary decided to return to the jail, where she now demanded to see her son. *Id.* The officers relented. *Id.*

Mary "instantly could tell something was wrong." *Id.* Her son "had a crazy look in his eyes" and asked her—his mother—if she knew his mother. *Id.* Mary noticed blood coming out of her son's ear. When she asked her son about this, he asked if she could help "find his mother so she could help him." *Id.* Of course, his mother was already there.

And she did try to help him. Mary returned to Noret and Cronk and told them about the blood in her son's ear and said that it "was a sign of brain injury." *Id.* She told them that her son had asked her if she knew his mother. *Id.* at 46. And she asked why her son could not be taken to a hospital for medical attention. *Id.* Abilene Police Department protocols prevented them from taking him to the hospital, they said. *Id.* Undeterred, Mary told Noret—both in person that day and over the course of the days that followed—that she would pay for an ambulance to take her son to the hospital. *Id.* at 46, 70. She implored Noret to consider the possibility that her son had a brain injury and the consequences that could result. *Id.* at 46. Still, protocol said that Brooks had to remain in the jail because the arresting officers had reported that Brooks was on drugs at the time of his arrest three days

earlier. *Id*. When Mary called the jail on March 8 and spoke to defendant Gabrielle Vargas to repeat her offer to arrange for an ambulance to take Brooks to the hospital, Vargas told her "that [she] could not demand anything [and] that [Brooks] was just drunk and high," before hanging up on her. *Id.*

Mary likely did not know that her son was returned to the ERC shortly after her visit. According to an incident report from the morning of March 8, Brooks—after visiting with his mother—attempted to pull away from Cronk while being escorted back to his cell. *Id*. at 16. Defendant John Elrod stepped in to assist Cronk. *Id*. at 104, 109, 110. Brooks continued resisting the pair's attempts to escort him back to his cell until Cronk sprayed his face with pepper spray. *Id*. at 66. Cronk then directed Smurphat to place Brooks in the ERC yet again. *Id*. From 9:26 a.m. until 3:00 p.m. on March 8, Brooks remained in the ERC. *Id*. By the time he was let out of the ERC for the last time, he had been in the jail for 73 hours—35 of them confined to the ERC without medical attention.

The next day, March 9, defendant Grogan reexamined Brooks. *Id*. at 30. She noted a small amount of dried blood was observable in Brooks's ear canal, but there was presently no bleeding, and Brooks was not complaining of any pain. *Id*. at 30, 84.

At some point on March 9, Brooks was, for reasons unknown, placed on administrative lockdown in a solitary-confinement cell. *Id*. at 41. Brooks alleges that the officers responsible for observing and monitoring him while he was in solitary confinement did neither, and he claims that their daily observation logs are fabrications. *Id.*; *see also e.g.*, Dkt. No. 53 at 42–45. He also claims that he was only permitted to leave his cell once during that period, and the officers did nothing to help him complete routine tasks like

eating, bathing, or relieving himself, despite the fact that he once showered while fully clothed.  Dkt. No. 54 at 41.  Brooks remained on administrative lockdown until his release.

That release finally came at 11:00 a.m. on May 13—seven days and twenty-one hours after his arrival.  *Id.* at 41.  Mary Brooks immediately took her son to the hospital, where he was diagnosed with a skull fracture, traumatic epidural and subdural hematomas, and an acute head injury.  *Id.* at 41–42, 145.  The attending neurosurgeon stated that Brooks's symptoms, "including pain, bleeding from the ear, [and] mental status changes that included his inability to speak or recognize family members, are signs of potentially serious brain injury and require immediate evaluation and possible treatment."  *Id.* at 146.  The surgeon also believed that "[a]ny extended delay" in diagnosing and treating such injuries "can result in undue suffering and potentially life altering changes in brain function," and therefore, in Brooks's case, "earlier evaluation would have been highly recommended."  *Id.* at 146.

## 2.  Procedural Background

Invoking 42 U.S.C. § 1983, Brooks sued a panoply of officers, officials, and Taylor County itself, claiming that each had violated his constitutional rights.  The defendants sued in their individual capacities asserted the affirmative defense of qualified immunity in their answers.  The Court, following best practices, ordered that Brooks file a reply to the answers that invoked qualified immunity.  *See, generally*, *Schultea v. Wood*, 47 F.3d 1427, 1433–34 (5th Cir. 1995) (en banc).

After considering Brooks's reply, the Court determined that the affirmative defenses of qualified immunity raised by the Taylor County jailers should be decided on an expedited basis by way of summary judgment.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  The

Court ordered the parties to file summary-judgment briefs addressing the jailers' entitlement to qualified immunity, and they have done so. Brooks was permitted to take limited discovery in support of his brief, while the jailers elected not to do the same. The jailers' motion for summary judgment is now fully briefed and ripe for decision.[2]

At the outset: The jailers' motion includes arguments reaching beyond the issue of qualified immunity presented in their answer, such as whether the County and Sheriff are entitled to summary judgment. Dkt. No. 45 at 37–46. Because the parties have not conducted discovery on those issues and because Brooks did not respond to the merits of those arguments, the Court declines to consider them at this juncture. And, because resolving the issue of qualified immunity requires looking beyond the pleadings, the Court declines to address the jailers' alternative request for judgment on the pleadings. *See* Fed. R. Civ. P. 12(d) (if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

3.     **Standards of Review**

Section 1983 "provides a claim against anyone who 'under color of any ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 23, 236 (5th Cir. 2008)).

---

[2] *See* Dkt. Nos. 44 (motion); 45 (brief in support); 52 (response); 53 (brief in opposition); 54 (appendix to brief in opposition); 61 (reply).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983.  Defendants who perform discretionary duties—such as police officers and jailers, *see, e.g.*, *id.*—are entitled to invoke the judicially created doctrine of qualified immunity in response to a plaintiff's Section 1983 suit. Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  And, despite its name, where qualified immunity applies, it is absolute.  So unless a defendant violates rights that are "clearly established," the plaintiff cannot recover under Section 1983.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up).  "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021).  In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted).  This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). When a defendant invokes qualified immunity in his answer, the burden shifts to the plaintiff to demonstrate that the defense is unavailable. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

Defeating an invocation of qualified immunity requires that the plaintiff "point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (cleaned up). "Summary judgment evidence" is evidence sufficient to support a verdict in the plaintiff's favor. If, however, "there is no genuine dispute as to any material fact," the defendants are entitled to judgment as a matter of law thanks to qualified immunity. Fed. R. Civ. P. 56(a). A plaintiff "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). And facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the Court must determine whether, after considering the evidence in the light most favorable to the nonmoving party (here, Brooks), a rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The Court may not weigh the evidence or evaluate the credibility of witnesses, *id.,* and any "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). So while the "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment," *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020), the plaintiff bears a heavy burden in overcoming a defendant's good-faith invocation of qualified immunity, *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

In sum, the Court's task is to review all of the evidence before it in the light most favorable to Brooks and ask, "Could a reasonable jury find that this defendant violated Brooks's clearly established rights?" If the answer is "no," then the defendant is entitled to summary judgment on the basis of qualified immunity. If the answer is "yes," then Brooks's claim against that defendant can proceed to trial.

## 4.    Analysis

The events that give rise to Brooks's suit unfolded while he was a pretrial detainee at the Taylor County jail. Under the Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The constitutional rights he seeks to vindicate thus "flow from both the procedural and substantive due process guarantees of the Fourteenth

Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).  When a plaintiff sues multiple defendants, the Court must "evaluate each officer's actions separately, to the extent possible." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).  So, to the extent practicable, the Court addresses each claim against each defendant separately.

Broadly, Brooks brings four discrete claims against differing groups of defendants: that excessive force was used against him; that his medical needs were met with deliberate indifference; that his time and treatment in solitary confinement was arbitrary and purposeless; and that the defendants stood by and watched as each of the foregoing unfolded.  Proceeding chronologically, the Court takes each in turn, sorting defendants along the way.

## A.    Counts Three, Four, and Five:  Excessive Force

Counts Three, Four, and Five of Brooks's complaint allege that defendants Olson, Spells, and Cronk, Smurphat, and Elrod, respectively, used force to such a degree that it constituted punishment of a pretrial detainee, in violation of his Fourteenth Amendment rights.  Dkt. No. 28 at ¶¶ 214–73; *see Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (holding that the Fourteenth—not the Eighth—Amendment is the proper basis for challenging excessive force against pretrial detainees).  All five invoked qualified immunity in response, arguing that Brooks did not establish an injury and that he failed to demonstrate that their conduct was objectively unreasonable.  Dkt. No. 45 at 18–23.  Only one defendant—Olson—is entitled to qualified immunity as to Brooks's excessive force claims.  Brooks has raised a genuine issue of material fact as to whether Spells, Cronk, Elrod, and Smurphat violated his clearly established constitutional rights.

– 11 –

### i.    Legal Standards Governing Excessive Force Claims

As in any case involving a defendant's invocation of qualified immunity, Brooks must rebut the defendants' affirmative defense by establishing that the defendants violated a statutory or constitutional right and that the unlawfulness of their conduct was clearly established.  In the excessive force context, satisfying the first prong—that a right was violated—requires showing an injury that resulted directly and exclusively from excessive force that was clearly unreasonable.  *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2020).  To be excessive, a use of force must be objectively unreasonable.  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Objective reasonableness turns on the facts and circumstances of each particular scenario and must be determined by considering the perspective of a reasonable officer acting in the moment, and not with the benefit of hindsight.  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Kingsley*, 576 U.S. at 396–97.

Many factors help determine whether a use of force was objectively reasonable.  *See Graham*, 490 U.S. at 396.  These include (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) whether the officer made an effort to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting.  But these factors are neither exhaustive nor exclusive.  *Kingsley*, 576 U.S. at 396–97.  In the same vein, a court must consider the legitimate need to manage detention facilities and defer to those policies and practices that are, in the judgment of jail officials, necessary to ensuring order and security.  *Id.* at 397 (quoting *Bell*, 441 U.S. at 540).

Even if the plaintiff proves that there is a genuine factual dispute about whether an officer used excessive force—thus meeting the first prong of qualified immunity—an officer "is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 400 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

The defendants argue that Brooks fails to show that each officer's use of force in restraining him in the ERC was excessive or objectively unreasonable. Defendants also deny that Brooks suffered an injury as a result of the force used. And defendants contend that Brooks fails to establish that the officers violated clearly established law. For reasons that will soon become apparent, the Court elects to address the "clearly established" prong of qualified immunity first. *Cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### ii.    The right to be free from excessive force was clearly established at the time.

The question is whether the state of the law in 2018 gave the officers fair warning that their alleged treatment of Brooks was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Brooks argues that *Kingsley* clearly established the unconstitutionality of using a restraint system like the ERC for prolonged periods against detainees who were neither a threat nor actively resisting. *Kingsley* offers him little support though: all *Kingsley* did was lessen Brooks's burden by negating the requirement that he show that the officers were subjectively aware that their conduct was unreasonable. 576 U.S. at 396–97.

But the Fifth Circuit has previously noted that the "lawfulness of force . . . does not depend on the precise instrument used to apply it." *Newman v. Guedry*, 703 F.3d 757, 763 (2012) (cleaned up). Likewise, "qualified immunity will not protect officers who apply

– 13 –

excessive and unreasonable force merely because their means of applying it are novel." *Id.*
at 763–64 (cleaned up).  And, in an obvious case, "the *Graham* excessive-force factors
themselves can 'clearly establish' the answer, even without a body of relevant case law." *Id.*
at 764 (cleaned up).

Brooks does, however, identify binding caselaw.  Brooks invokes *Hope v. Pelzer*,
536 U.S. 730 (2002), and *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), to argue that the
officers were on notice that their alleged conduct violated clearly established law, even if
there is no binding case with substantially identical facts.  Dkt. No. 53 at 61, 67; *Hope*, 536
U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law
even in novel factual circumstances.").  In *Hope*, the Supreme Court held that officials had
violated an inmate's Eighth Amendment rights when they responded to his disruptive
behavior by handcuffing him to a hitching post in a restrictive position for seven hours,
shirtless, in direct sunlight, with no bathroom breaks and only one or two water breaks.
*Hope*, 536 U.S. at 734–35.  The Court held that the constitutional violation was obvious
because "[a]ny safety concerns had long since abated." *Id*. at 731.  And in *Gates* the Fifth
Circuit held that handcuffing inmates to fences or cells or forcing inmates to stand, sit or lie
on crates, stumps, or otherwise maintain awkward positions for prolonged periods violated
the Eighth Amendment.  501 F.2d at 1306.  While the defendants are correct in noting
differences between Brooks's circumstances and those in *Hope* and *Gates*, the pair provide
support for Brooks's assertion that the officers' conduct here violated clearly established law.

Moreover, while binding on neither the Court nor the officers, the Sixth Circuit's
decision in *Barker v. Goodrich* is instructive.  649 F.3d 428 (6th Cir. 2011).  While *Barker*

involved an Eighth Amendment challenge, the facts were substantially similar.[3]  There, an inmate was "handcuffed behind his back for twelve hours, during which time he missed a meal and was unable to sit or lie down without pain, use the restroom, or obtain water from the fountain."  649 F.3d at 434.  Relying in part on *Hope* and *Gates*, the *Barker* Court held that the defendants' alleged conduct violated Barker's clearly established rights under the Eighth Amendment.  *Id.* at 434–47.  It went on to explain that binding and persuasive case law established that "restraining an inmate in an uncomfortable position and denying access to water" or a toilet—could rise to a constitutional violation "if allowed to persist for an extended period."  *Id.* at 435.

The defendants argue that they cannot be expected to know that *Hope* applies to pretrial detainees—such a conclusion "would not be reached by *every* reasonable official." Dkt. No. 45 at 21.  The Court disagrees.  The defendants are, of course, correct that most officers "possess no legal training or an in-depth understanding of the Constitution."  *Id.* But concluding that *Hope* applies to pretrial detainees requires neither; it only requires knowing a bedrock principle of law—that pretrial detainees cannot be punished.  If an officer may never punish a pretrial detainee, he may, definitionally, never punish a pretrial detainee in a way that violates the Eighth Amendment.  The Court therefore concludes that every reasonable officer would recognize that *Hope* applies to pretrial detainees.

The defendants' other attempts to distinguish *Hope* are no more convincing. Whether Brooks was wearing a shirt, in direct sunlight, or taunted do not affect whether the defendants' conduct in a "novel factual circumstance" was prohibited by clearly established

---

[3] As a pretrial detainee, Brooks could not be punished—let alone maliciously or sadistically. *See Kingsley*, 576 U.S. at 400.  Any distinction between *Barker* and this case on the basis of the detainee/prisoner distinction must, therefore, accrue to Brooks's benefit.

law.  *Hope*, 536 U.S. at 741.  *Hope* made clear that the purposeless and prolonged restraint of

an inmate is prohibited by the Constitution, and it did so by eschewing the "rigid[ ]

overreliance on factual similarity" urged by the defendants.  *Id*. at 742.

Caselaw is not the only source of clearly established law, however.  Regulations

governing the operation of detention facilities can be relevant to whether a right was clearly

established.  *See Hope*, 536 U.S. at 743–45.  Recognizing this, Brooks invokes the Texas

Commission on Jail Standards and its minimum operational standards related to the use of

restraints.  Dkt. No. 53 at 48; Dkt. No. 54 at 120–121.  Those regulations provide that

inmates should be removed from restraints as soon as they are no longer exhibiting behavior

necessitating restraint.  37 Tex. Admin. Code § 273.6.[4]  The standards also indicate that,

while in restraints, inmates should be properly monitored and cared for.  *Id.*  To the extent

the defendants' conduct deviated from these standards, a reasonable jury could conclude

that the defendants violated law that was clearly established at the time.

Qualified immunity protects officers only when they do not have fair warning that

their actions were unconstitutional.  Taken together, binding and persuasive caselaw and

applicable regulations gave a fair and clear warning that, at the time of Brooks's detention,

the prolonged, purposeless restraint of a pretrial detainee violated the detainee's

constitutional rights.  And, viewing the evidence in the light most favorable to Brooks, his

detention in the ERC could reasonably be viewed as prolonged and purposeless.  Brooks has

therefore satisfied the "clearly established" prong of qualified immunity.

---

[4] The version cited to by Brooks is not technically identical to the regulations in effect at the time of
Brooks's confinement, but in all relevant aspects the versions are the same.  *Compare* 37 Tex. Reg.
7196 (Sept. 12, 2012) (adopting without modification 37 Tex. Reg. 3784) (2018 version) *with*
37 Tex. Admin. Code § 273.6 (Dkt. No. 54 at 120–21).

> iii.     **Some, but not all, of the defendants may have used excessive force.**

Demonstrating that the law was clearly established at the time of the alleged harm is insufficient to defeat qualified immunity, though.  Brooks must also demonstrate facts sufficient to support the conclusion that a defendant used excessive force.  Doing so requires him to show that—in light of all the facts and circumstances at the time and mindful of the deference owed to policies designed to protect the safety of detainees and officers—the force used against him was objectively unreasonable.  While Brooks has not done so as to defendant Olson, he raises genuine issues of material fact as to whether defendants Spells, Cronk, Elrod, and Smurphat used excessive force against him.

> a.     **Olson did not.**

Brooks has failed to demonstrate that there is a genuine dispute of material fact as to whether Olson used excessive force against him.  In Count Three, Brooks claims that Olson used excessive force when placing him in the ERC on March 5 after Brooks's initial intake.  It is, of course, undisputed that Brooks remained in the ERC for 23 hours thereafter.  Dkt. No 54 at 6–8, 109.  But no evidence has been presented to show that Olson was involved in Brooks's continued confinement in the ERC.

The relationship between the need for force and the amount of force Olson used weighs in Olson's favor.  Brooks claims that there was no need for Olson to use any force against him, so his placement in the ERC was excessive and objectively unreasonable.  Dkt. No. 53 at 51.  Brooks argues that there was no indication that he was combative or threatening when he arrived and that he was compliant with the officers' orders.  Dkt. No. 54 at 78.  But Brooks ignores the notation in Olson's report that Abilene Police "had notified the jail that they were bringing in a combative person."  Dkt. No. 54 at 7.  Brooks

has also conceded that he was confused, disoriented, and incoherent upon his arrival. *Id.* at 37. The standard is an objective one, and regardless of whether Olson actually believed that Brooks was a threat, there is some undisputed evidence that could have led Olson to conclude that some force was necessary to maintain order and institutional security. Moreover, Brooks presents no evidence that Olson used force—let alone unreasonable force—to place and secure him in the ERC. Accordingly, Brooks has not presented evidence to show that his initial placement in the ERC was objectively unreasonable in light of the circumstances.

And while there is certainly a question of whether it was excessive or unreasonable to leave Brooks in the chair for 23 hours, Brooks has not presented any evidence to show that any of his alleged harm during that time is attributable to Olson. There is uncontroverted evidence that Olson placed Brooks in the ERC at shift change. Dkt. No. 54 at 110. In contrast, there is no evidence Olson was even present during Brooks's 23-hour confinement or that he was involved in determining whether and when to remove Brooks from the ERC. Likewise, Brooks offers no evidence that Olson determined Brooks's treatment while restrained in the ERC. And Brooks has not alleged a claim against Olson in his supervisory capacity. The relationship between the force needed and that used therefore weighs in Olson's favor.

So, too, does the extent of Brooks's injuries stemming from his placement in the ERC. As noted, there is no evidence that the placement of Brooks in the ERC—rather than the length of his confinement therein—caused any injury to Brooks. And although Olson was responsible for the fact of Brooks's confinement in the ERC, he was not responsible for

the duration or conditions of that confinement, so injuries sustained as a result of those circumstances are not properly attributed to him.

In contrast, Olson's failure to investigate the Abilene officers' reports that Brooks was combative tilts against him.  There is no indication that Olson attempted to verify or disprove whether Brooks presented a risk to himself or others.  Nor is there any evidence that he considered or attempted any force-free means of gaining Brooks's compliance.  And while state or municipal policy may have required a certain degree of monitoring, *see* Dkt. No. 54 at 109–10, the mere existence of such a policy says nothing about whether Olson actually acted in accordance with those policies and thus attempted to temper or limit the amount of force used.  With no evidence that Olson attempted to temper or limit the force used against Brooks, this factor weighs slightly in Brooks's favor.

But the remaining factors counsel in Olson's favor.  Olson could have reasonably perceived that both a threat and a security problem existed based on the Abilene officers' warning and Brooks's behavior upon arrival.  And while there is no indication that Brooks was actively resisting, this alone does not indicate that Olson used excessive force or was objectively unreasonable when placing Brooks in the ERC.

Viewing the evidence in the light most favorable to Brooks and having considered the facts and circumstances of his placement in the ERC with *Kingsley*'s guidance, the Court concludes that there is no genuine dispute of material fact as to whether Olson used excessive force against Brooks.  Because a showing of excessive force is necessary for Brooks to defeat Olson's invocation of summary judgment, Brooks cannot carry his burden; Olson is entitled to qualified immunity as to Count Three.

      **b.**    **Spells may have used excessive force in violation of Brooks's clearly established rights.**

Count Four alleges that defendant Spells used excessive force against Brooks by placing Brooks into the ERC on March 7—two days after Brooks arrived at the jail.  Dkt. No. 28 at ¶¶ 233–251.  Brooks remained in the ERC for nearly seven hours after Spells ordered him restrained.  Dkt. No. 54 at 115.  The Court concludes that there are genuine disputes of material fact regarding whether Spells used excessive force.

The summary-judgment evidence indicates that hours before being placed in the ERC for the second time, Brooks was rattling cell bars and being disruptive; Spells ordered him to stop.  Dkt. No. 54 at 115, 11.  At some point, Spells attempted to speak with Brooks, but Brooks was unable to complete a whole sentence or repeat his name.  *Id.*  After several hours, Brooks continued to rattle the bars, so Spells placed him in the ERC, where he remained for nearly seven hours.  *Id.*

"Officers may consider a detainee's refusal to comply with instructions 'in assessing whether physical force is needed to effectuate . . . compliance.'"  *Sabbie v. S.W. Corr., LLC*, No. 5:17-CV-113-RWS-CMC, 2019 BL 477152, at *57 (E.D. Tex. Mar. 6, 2019) (citing *Westfall v. Luna*, 903 F.3d 534, 548 (5th Cir. 2018)).  "The Fifth Circuit has also recognized that use of a restraint chair does not violate constitutional norms where, as here, it is reasonably related to a legitimate governmental objective such as the cessation of destructive or disruptive behavior."  *Warren v. Smith*, No. 15-2350, 2016 WL 6637971, at *7 (W.D. La. Nov. 9, 2016) (citing *Blakeney v. Rusk Cnty. Sheriff*, 89 F. App'x 897, 899 (5th Cir. 2004) (finding no constitutional violation where a disruptive pretrial detainee was confined in a restraint chair for 20 hours but was allowed to use the bathroom and given water)).  Accordingly, based on these circumstances and the undisputed evidence in this case, the

Court concludes Spells did not use force that was excessive or objectively unreasonable in initially placing Brooks in the ERC.

But unlike Olson, Spells was responsible for the length of Brooks's confinement in the ERC.  "[O]fficers must assess not only the need for force, but also the relationship between the need and the amount of force used."  *Westfall*, 903 F.3d at 548.  The Court therefore must consider whether Brooks's prolonged stay in the chair was excessive or unreasonable in light of the circumstances.  Weighing the *Kingsley* factors, Brooks has raised a genuine dispute of material fact as to whether Spells used excessive force that was objectively unreasonable in keeping Brooks restrained for nearly seven hours without proper care or necessities.

The first factor—the relationship between the need for force and the amount of force used—weighs against Spells.  The fact that Brooks remained in the ERC for nearly seven hours likely does not, by itself, demonstrate that the amount of force used was excessive or objectively unreasonable.  *See, e.g.*, *Byers v. Navarro Cnty.*, 2012 WL 677203, *6 (N.D. Tex. Mar. 1, 2012) (applying *Blakeney* and concluding that the prisoner's failure to present evidence that she suffered any form of injury due to her extended placement in a restraint chair, or that guards acted maliciously in restraining, entitled guards to summary judgment on qualified immunity).  Here, however, Brooks has offered evidence to raise a material fact dispute as to whether the use of force in denying him proper care and necessities while in the ERC was proportional to the need to restore order, especially once his disruptive conduct—rattling the bars—had ceased.

Just as with Olson, Brooks claims that Spells's use of the ERC violated the minimum standards established by the Texas Commission on Jail Standards for the use of restraints.

Dkt. No. 28 at ¶¶ 243–245.  Brooks notes that the TCJS says that while in restraints, an

"inmate should receive medical care a minimum of every two hours, to include changing

position, exercising extremities, offering nourishment and liquids, offering toilet facilities,

checking for medication needs, and taking vital signs."  Dkt. No. 53 at 14 (quoting 37 Tex.

Admin. Code § 273.6); Dkt. No. 28 at ¶ 70 (same).  In his sworn declaration, Brooks claims

that while in the ERC the second time he did not receive medical care, and he was not

offered food, water, access to a toilet, or the opportunity to stretch.  Dkt. No. 54 at 38–39.

Defendants do not dispute this evidence.

Despite having the authority to do so, Spells did not remove Brooks from the ERC.

*Id.* at 116.  When asked why Brooks was removed from the ERC, Spells said he did not

know but that Brooks "was not compliant with orders given so as be removed."[5]  *Id.* at 116.

In support of this critical assertion, the defendants offer no evidence as to what orders

Brooks was given and disobeyed.  And the defendants offer no explanation for their alleged

failure to comply with the standards set forth by the TCJS.  Brooks has therefore presented

undisputed evidence to raise a material question of fact as to whether the use of force was

proportional to the need.

The second factor—the extent of the injury suffered—weighs against Brooks.  The

defendants contend that Brooks cannot show a violation because his injuries were *de

minimis*.  Dkt. No. 45 at 19; Dkt. No. 61 at 14.  To the extent Brooks did suffer back pain,

body pain, cuts, bruises, or numbness in his legs due to the ERC, such injuries are *de

minimis*.  *Brooks v. City of W. Point*, 639 F. App'x 986, 990 (5th Cir. 2016).  But even if

---

[5] Spells's answer begs the question:  If, as evidenced by Spells's answers, compliance was not a
prerequisite to removal from the ERC, why was Brooks not removed sooner?

Brooks's injuries were *de minimis*, this alone is not fatal to his claim: a prisoner need not

"show more than a '*de minimis*' injury to establish a claim of excessive force" because the

Supreme Court has instructed courts to "'decide excessive force claims based on the nature

of the force rather than the extent of the injury.'" [6]  *Wilson v. Rheams*, 494 F. App'x 469, 470

(5th Cir. 2012) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010), and citing *Hudson v.*

*McMillan*, 503 U.S. 1, 6–7 (1990)).

      The defendants argue that these *de minimis* injuries are hardly evidence of excessive

force.  Dkt. No. 61 at 19–20.  In his declaration, Brooks claims that during his second stint

in the ERC—without medical care, food and water, and facility use or stretch breaks—he

suffered in agonizing pain, and his traumatic brain injury and associated head pain were

exacerbated.  Dkt. No. 54 at 38.  But Brooks does not provide factual allegations or

evidence concerning how the use of the ERC, rather than the delay he experienced in

getting medical attention, exacerbated his injuries.  Dr. Edelman—the neurosurgeon who

treated Brooks—notes that any delay in medical care can result in undue suffering.  *Id.* at

145–46. [7]  But that statement says nothing about how restraint in an ERC rather than, say, a

---

[6] Another district court in Texas confronted with similar facts has concluded that a claim of
excessive force that results in only *de minimis* injuries can only be sustained if the plaintiff
demonstrates that the injuries were the product of a malicious or sadistic use of force.  *See Davis v.*
*Hernandez*, No. A-17-CV-744-RP, 2019 WL 691206, at *4 (W.D. Tex. Feb. 19, 2019) (Pittman, J.).
The Court, with respect, disagrees.  *Kingsley* made clear that objectivity is the cardinal rule in
excessive-force claims.  Reintroducing subjectivity is therefore at odds with *Kingsley*, particularly
given *Kingsley*'s silence as to any distinction between *de minimis* injuries and non–*de minimis* injuries.

[7] The defendants' reply argues that, once the immediate aftermath of the injury had passed, the
urgency to diagnose and treat Brooks evaporated.  Dkt. No. 61 at 19 ("[Dr. Edelman] does not
opine that at any time while in custody that the injury was worsened or actually needed immediate
treatment. In fact, he opines that the time of injury was the critical time period, not at any given
point in time while incarcerated." (citing Dkt. No. 54 at 145–46)).  This reading of Dr. Edelman's
affidavit is as strained and as striking as it is illogical.

standard cell, affected Brooks's recovery.  With no evidence as to how the ERC contributed to his injures, this factor weighs against Brooks.

Other factors weight against Spells.  There is no evidence that Spells did anything to limit or temper the force used once any disruption abated.  There is no evidence indicating that Spells perceived any threat or security issue once Brooks was restrained.[8]  Nor is there evidence that Brooks was actively resisting the officers before or during his second confinement in the ERC.

Although his injuries resulting from his second confinement in the ERC were likely minor or *de minimis*, Brooks has shown a genuine dispute as to whether there was a need to use any force after he was restrained and his disruptive conduct had ceased, whether the force used was proportionate, and whether Spells reasonably perceived any threat or risk from Brooks.  As a result, a reasonable jury could find that Spells used excessive force against Brooks.  Given the Court's earlier conclusion that contemporaneous clearly established law prohibited the alleged conduct, Brooks has defeated Spells's invocation of qualified immunity, and Count Four may proceed to trial.

### c.    Cronk, Elrod, and Smurphat may have, too.

Count Five addresses Brooks's third stint in the ERC, from 9:26 a.m. until 3:00 p.m. on March 8.  Brooks alleges that defendants Cronk, Smurphat, and Elrod used excessive force by restraining him in the ERC for five-and-a-half hours while his eyes, nose, and face were burning from pepper spray that was not cleaned from his face before or while he was

---

[8] The Tenth Circuit has denied summary judgment under similar circumstances.  *See Blackmon v. Sutton*, 734 F. 3d 1237 (10th Cir. 2013) (holding that a material fact question existed where the inmate "was placed in the chair because of a legitimate threat of self-harm but then arguably kept there for extensive periods after any threat of self-harm had dissipated").

restrained.  Dkt. No. 54 at 75, 66, 16, 39–40, 77, 69, 104.  The Court concludes that there are genuine disputes of material fact regarding whether Cronk, Smurphat, and Elrod used excessive force in violation of clearly established law.

Based on Elrod's incident report, after Brooks visited with his mother on March 8, Brooks began yelling[9] and attempted to pull away from Cronk while being escorted back to a cell.  *Id.* at 16.  Elrod stepped in to help Cronk gain control and escort Brooks down the hall.  *Id.* at 16, 75.  After more than one command to calm down and stop resisting, Brooks continued to resist, and Cronk sprayed Brooks in the face with pepper spray.  *Id.* at 16. Smurphat then stepped in to help, and Brooks was placed in the ERC without further incident, where he remained from 9:26 a.m. until 3:00 p.m.—just over five and a half hours. *Id.* at 16, 66, 75–76.  Elrod and Cronk's interrogatory responses corroborate the facts contained in the incident report, but Smurphat claims he does not recall any interactions with Brooks.  *See id.* at 66, 75, 103–04.

As with Olson and Spells, once the need to maintain order in the jail and keep Brooks from being a danger to himself and others had ceased, the continued use of force was unnecessary.  The defendants have demonstrated a legitimate need to use force based on their determination that Brooks was noncompliant.  And the amount of force used in initially placing Brooks in the restraining chair was proportional to the need to preserve order and discipline and maintain security.

---

[9] In her sworn declaration, Mary Brooks claims that Brooks was not yelling or acting aggressively when he walked away from their visit.  Dkt. No. 54 at 45.  This fact is therefore disputed.  Brooks does not, however, contest the remaining circumstances leading up to his placement in the ERC, so this disputed fact is immaterial.

But even assuming the officers employed reasonable and proportional force when they placed Brooks in the ERC, there is a genuine dispute of material fact as to whether the force used became excessive or unreasonable once the need for force had abated and Brooks was restrained. "Once a prisoner has been subdued, using gratuitous force on him is unreasonable." *Preston v. Hicks*, 721 F. App'x 342, 345 (5th Cir. 2018) (citing *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016)). The defendants present no evidence that Brooks continued to pose a risk to safety or good order while he was restrained. A reasonable jury could find that the need to use force abated long before Brooks was eventually released from the ERC, and his restraint beyond that point was, accordingly, unreasonable and excessive.

None of this even touches on the pepper spray. Under Brooks's version of the facts, he was left unattended in the ERC for over five and a half hours with pepper spray on his face and eyes and without medical care, food, water, bathroom respite, or the chance to stretch. Dkt. No. 54 at 40. Cronk claims in his interrogatory response that Smurphat cleaned the pepper spray off of Brooks's face and eyes. *See id.* at 69. But Smurphat has no recollection of doing so, nor does Elrod—the other officer present. *Id.* at 104, 77. This fact is thus disputed in a way that only a jury can resolve. At this stage, the Court cannot make credibility determinations or weigh the evidence in ruling on a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Viewing, as it must, the evidence in the light most favorable to Brooks, and assuming he remained in the ERC for a prolonged period without proper care or decontamination, the Court concludes that there is a genuine issue of material fact as to whether the officers used excessive force by leaving Brooks in the ERC for five hours while his face was covered with pepper spray.

– 26 –

Whether the extent of the injuries attributable to the officers' conduct weights for or against them is a difficult question. In addition to the same injuries allegedly caused by his first two stints in the ERC, Brooks claims that his eyes, nose, and face were burning because the pepper spray was never cleaned from his face or eyes. Dkt. No. 54 at 39–40. The Fifth Circuit has held that the expected effects of being pepper sprayed constitute a *de minimis* injury. *See, e.g.*, *Bradshaw v. Unknown Lieutenant*, No. 02-10072, 2002 WL 31017404 (5th Cir. 2002) (explaining that an inmate's "burning eyes and skin for approximately 24 hours, twitching of his eyes, blurred vision, irritation of his nose and throat, blistering of his skin, rapid heartbeat, mental anguish, shock and fear as a result of the use of mace" after the use of pepper spray was nothing more than a "*de minimis* injury").

But, as explained above, there is a dispute over whether Brooks's face was decontaminated. *See also* Dkt. No. 54 at 69, 104. And the Fifth Circuit has not addressed whether leaving a detainee contaminated with pepper spray constitutes more than a *de minimis* injury. The Eleventh Circuit has, though. In *Danley v. Allen,* that court confirmed that preventing a detainee from decontaminating himself is an independent form of excessive force. 540 F.3d 1298, 1308 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (noting that, because the jailers took only inadequate measures to ameliorate the effects of their use of force, Danley spent twelve hours suffering without being able to fully decontaminate himself). *Danley* does not bind the Court, but it is informative. There, the detainee was permitted a brief shower shortly after being pepper sprayed, but that was still deemed inadequate. 540 F.3d at 1305. Here, by contrast, Brooks could not shower—he was strapped into the ERC and thus at the mercy of the officers for relief from their pepper spray.

Taking the facts in the light most favorable to Brooks, there is evidence to support Brooks's position that the officers inflicted gratuitous pain on him by failing to remediate their use of force. *See, e.g.*, *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (explaining that officials may not use chemical sprays against detainees "for the sole purpose of punishment or the infliction of pain"). Under the core judicial inquiry into the nature of the force rather than its products, the infliction of gratuitous pain is, by definition, not *de minimis*. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."); *see also Cowart v. Erwin*, 837 F.3d 444, 454 ("'[C]ourts have frequently found constitutional violations in cases where a restrained or subdued person is subjected to the use of force.'" (quoting *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 479 (5th Cir. 2014)). Thus, a reasonable jury could conclude that the failure to decontaminate Brooks's face was excessive and unreasonable force that resulted in more than a *de minimis* injury.[10]

The remaining factors likewise weigh in Brooks's favor. While there is evidence that Brooks resisted prior to being placed in the ERC, there is no indication that he continued to resist once restrained. And, just as with Spells, there is no indication that whatever concern led to Brooks's restraint persisted after he was secured in the ERC.

Viewing the evidence in the light most favorable to Brooks, the Court concludes that Brooks has provided sufficient evidence to show that there is a genuine issue of material fact as to whether Cronk, Elrod, and Smurphat used unreasonable and excessive force in

---

[10] If the *Davis* court were correct that recovering for a *de minimis* injury requires proving that the use of force was malicious or sadistic, *see supra* at n.6, it is difficult to see how a gratuitous use of force like that alleged by Brooks in Count Five could fail to satisfy that test.

violation of clearly established law when they restrained Brooks in the ERC on March 8. They are, therefore, not entitled to qualified immunity. Count Five will proceed to trial.

### B.    Count Six: Deliberate Indifference

Count Six alleges that defendants Smurphat, Olson, Phillips, Vargas, Elrod, Grogan, Horton, Cronk, Noret, Spells, Maina, Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney were deliberately indifferent to Brooks's medical needs while he was detained, in violation of clearly established law.[11]   Dkt. No. 28 ¶ 282.  While a state may detain defendants for trial, its "exercise of its power to hold detainees and prisoners, however, brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being."  *Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc).  The Fourteenth Amendment guarantees arrestees the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials."[12]  *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, among others, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

### i.    The deliberate-indifference standard

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).  "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).  "To succeed on a deliberate-indifference claim, plaintiffs must show that

---

[11] Although defendants Farmer and Meiser are named in Count Six, they are not parties to this round of briefing and are thus not addressed in this opinion.

[12] In this regard, an arrestee is akin to a pretrial detainee.  *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472–73 (5th Cir. 1996).

(1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino*, 239 F.3d at 755).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "Negligence or even gross negligence is not enough: the officials must have had actual knowledge of the substantial risk." *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) (citing *Hare*, 74 F.3d at 650). Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to deliberate indifference. *Farmer*, 511 U.S. at 838.

Under exceptional circumstances, an "official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008) (citing *Farmer*, 511 U.S. at 842 & n.8). This exception has been applied in cases where the severity of the risk or injury is obvious or the cause of that injury or harm is plainly evident to the official. *See, e.g.*, *Easter v. Powell*, 467 F.3d 459, 463–64 (5th Cir. 2006) (holding that a prison nurse's subjective awareness was inferable where she was aware of the detainee's heart condition, and the detainee presented obvious signs of serious cardiac health risks); *Brannan v. City of Mesquite*, No. 3:19-CV-1263-X, 2020 WL 7344125, at *3–4, 6 (N.D. Tex. Dec. 14, 2020) (finding that plausible facts existed to show that the substantial risk of serious harm was obvious where the arresting officer observed the arrestee swallow what he believed to be a bag of methamphetamine and observed the arrestee's rapid

decline); *Dyer*, 964 F.3d at 377–79, 85 (finding sufficient facts for a jury to reasonably infer subjective awareness where the officer knew the arrestee was on LSD, observed him violently banging his head against interior of a police car over 40 times during transport, and the arrestee had a visible and serious head injury).

"[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 458; *see also Gobert*, 463 F.3d at 346 ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."). Instead, "the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs." *Domino*, 239 F.3d at 756. "A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Additionally, "each defendant's subjective deliberate indifference, *vel non*, must be examined separately." *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

The Court now turns to whether Brooks has presented evidence sufficient to raise a genuine dispute of material fact as to each defendant named in Count Six. A reasonable finder of fact could not find that Smurphat, Horton, Elrod, Grogan, Olson, Spells, Maina, Phillips, Henry, McDonald, Luna, Donnel, Flores, O'Bar, or Chaney were deliberately indifferent to Brooks's medical needs. The same cannot be said for Cronk, Vargas, or Noret.

ii.     **Most of the defendants are entitled to summary judgment as to Count Six.**

a.      **Smurphat**

Brooks has not raised a genuine dispute of material fact regarding whether Smurphat acted with deliberate indifference towards Brooks's serious medical needs.  Brooks does not allege that Smurphat was actually aware that Brooks faced a substantial risk of serious harm; instead, he claims that Smurphat's awareness can be inferred because the risk was obvious based on the circumstances.

Smurphat was present during Brooks's initial intake.  Dkt. No. 54 at 7.  The evidence indicates that Brooks would not answer any of Smurphat's questions, and he was unable to sign the intake paperwork Smurphat completed.  *Id.* at 7, 22.  Despite indicating on the medical screening form that Brooks did not appear to be under the influence of alcohol or drugs, Smurphat added a handwritten statement on the top of the form that said "complete when sober."  *Id.* at 20, 101.  At a minimum, then, there is evidence that he believed Brooks to be intoxicated during intake.

Smurphat contends that he does not remember any interactions with Brooks; that he was not a supervisor at the time; and that as the booking officer, he would not have had any interactions with Brooks after intake.  *Id.* at 102–03.  But Brooks offers evidence that Smurphat's next interaction with Brooks came three days later, on March 8, when Smurphat helped place Brooks in the ERC for the third time.  *Id.* at 15–16.  This is corroborated by statements from the other officers.  *Id.* at 75, 66.

Viewing the evidence in the light most favorable to Brooks, Brooks has shown that (1) Smurphat knew Brooks was unable to communicate or sign his name on March 5; (2) Smurphat believed Brooks to be intoxicated on March 5; and (3) Smurphat knew Brooks

was being resistant to officers' commands on March 8.  But this evidence is not sufficient to show a genuine issue of material fact as to whether Brooks's need for medical attention was so objectively obvious to Smurphat that this is one of the rare cases in which the Court should infer a defendant's subjective awareness.  Smurphat is therefore entitled to summary judgment as to Count Six.

### b.   Horton

Nor has Brooks raised a genuine dispute of material fact regarding whether Horton is entitled to qualified immunity.  Horton interacted with Brooks during his initial intake on March 5 and again on March 8, when he attempted to complete a screening form.  Dkt. No. 54 at 59.  Viewing the facts in the light most favorable to Brooks, Horton was aware that Brooks was unable to communicate upon his arrival on March 5 and that Brooks was still unable to communicate three days later.  *Id.* at 7–8, 18, 59.  In a report on March 8, Horton wrote, "Subject is recovering from usage of unknown substance—he is unable to effectively communicate—he will speak in gibberish—will be placed on 30 min suicide watch if housed."  *Id.* at 18, 59.  Brooks also notes that Horton was trained on the potential issues of drug or alcohol intoxication.  *Id.* at 61.

Even if these facts are sufficient to show that Horton could have plausibly drawn an inference of substantial risk of serious harm—thereby meeting the first prong of deliberate indifference—Brooks has not shown that Horton actually drew this inference or that the risk was so obvious such that Horton's subjective awareness can be inferred.  "The Fifth Circuit has concluded that the fact that a detainee exhibits signs of intoxication, 'including confusion, slurred speech, and loss of coordination,' alone does not give an officer knowledge that the detainee is in serious need of medical care."  *See Hines v. Henson*, 293 F.

– 33 –

App'x. 261, 263 (5th Cir. 2008). And under almost identical circumstances, the Seventh Circuit affirmed summary judgment on a deliberate-indifference claim where there was no evidence that the officials knew of the detainee's condition—a subdural hematoma requiring an emergency craniotomy—even though the record supported an inference that they should have known. *Qian v. Kautz*, 168 F.3d 949, 956 (7th Cir. 1999) ("Although it may be objectively unreasonable to believe that an individual would continue to exhibit signs of intoxication after 72 hours in police custody, there is nothing in the record to suggest that the defendants' belief that this was the case was not honestly held.").

Here, nothing in the record indicates that Horton actually knew that Brooks needed immediate medical attention. Rather, the evidence indicates that Horton believed him to be intoxicated and that the situation could be controlled by placing Brooks on thirty-minute suicide watch for close observation. And although Horton did not take steps to confirm that Brooks was actually intoxicated, there is no indication that his belief was not honestly held. So even if Horton should have been aware of the severity of Brooks's condition based solely on these two interactions, the Court finds that the facts here do not reach the level of cases where the substantial risk of serious harm is so obvious such that the officers' subjective awareness can be inferred. The Court therefore concludes that Horton is entitled to summary judgment on Count Six based on qualified immunity.

### c.    Elrod

So, too, for Elrod. Elrod assisted with Brooks's intake on March 5 and with Brooks's placement in the ERC on March 8. Dkt. No. 54 at 7–8; 78. Brooks does not allege that Elrod had actual subjective awareness of a substantial risk of serious harm; rather, he claims that the risk was so obvious to Elrod that his subjective awareness can be inferred. In his

interrogatory responses, which are undisputed, Elrod states that (1) during intake, Brooks was compliant but did not speak; (2) Brooks's vitals were taken, and the nurse indicated that he did not need further medical attention at that time; and (3) he assisted in placing Brooks in the ERC after Brooks continued to pull away from officers and disregard orders.  *Id.* at 78.  Contrary to Brooks's assertion, this evidence does not support the conclusion that Brooks's need for medical attention was sufficiently obvious.

While Elrod was aware that Brooks demonstrated some signs of possible intoxication on March 5, the record also reflects that Brooks was compliant and cleared by a nurse.  And Brooks does not provide evidence indicating that Elrod observed behavior consistent with a serious risk of medical harm on March 8, as opposed to behavior consistent with a noncompliant detainee.  Even assuming Elrod was aware that Brooks was still noncommunicative on March 8, this fact alone cannot tip the scale.  On March 8, Brooks was conscious, able to resist force, and seemingly complied with orders to calm down. Even viewing the evidence in the light most favorable to Brooks, the Court concludes that Brooks has failed to provide evidence that it was obvious to Elrod that Brooks needed immediate medical attention, and therefore Elrod is entitled to qualified immunity on this claim.[13]

### d.    Grogan

Brooks has failed to raise a genuine dispute of material fact as to whether Grogan acted with deliberate indifference, too.  The summary-judgment evidence indicates that

---

[13] Brooks also claims that Elrod acted with deliberate indifference by restraining him in the ERC for hours without cleaning pepper spray off his face or eyes, thus allowing it to burn for the entire time.  Dkt. No. 53 at 84–85.  But the harm that flowed from this alleged conduct is addressed in the Court's consideration of Brooks's excessive-force and bystander-liability claims.

during Brooks's initial intake, Grogan told officers that Brooks's vital signs were good and that he did not seem to be experiencing a medical emergency. Dkt. No. 54 at 7. Grogan conducted another examination on March 9 based on requests from Brooks's mother. Dkt. No. 54 at 30, 84. Grogan wrote in a report that Brooks had a "sm[all] am[oun]t of dried blood seen in ear canal. No [complaining of] pain no actual bleeding." *Id.* at 30. Nothing more was done in response. *Id.* at 84.

Even if this evidence were sufficient to show that Grogan actually knew of a substantial risk of serious harm, Brooks has not presented adequate summary-judgment evidence that Grogan was deliberately indifferent to that risk. At most, Brooks's argument and evidence show that Grogan acted with negligence or gross negligence in not taking further steps to treat Brooks after examining him, which is insufficient to state a claim for deliberate indifference. *See Thompson*, 245 F.3d at 459. And the Fifth Circuit has long held that "the decision whether to provide additional treatment is a classic example of a matter for medical judgment, which fails to give rise to a deliberate-indifference claim." *Dyer*, 964 F.3d at 381 (citations and quotation marks omitted) (holding that deliberate indifference was not shown where paramedics may have been negligent in failing to take further steps to treat a head injury and the other drug-induced behavior of arrestee); *Stewart*, 174 F.3d at 533–34 (holding that a prison physician's failure, among other things, to discover earlier the ulcers that led to a prisoner's death "might constitute negligence, [but] not the requisite deliberate indifference."); *see also, e.g.*, *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (clarifying that "mere disagreement with one's medical treatment is insufficient to show deliberate indifference"). In light of these standards, the Court concludes that Grogan is entitled to summary judgment as to Count Six on the basis of qualified immunity.

### e.    Olson

The Court reaches the same conclusion as to Olson.  Brooks claims that Olson was aware of facts so obvious and apparent that even laymen would recognize that care was required, but that Olson exercised deliberate indifference in placing Brooks in the ERC. Dkt. No. 53 at 93.  This argument is not persuasive.

Olson's only interaction with Brooks was when he was initially brought into the jail. Although Brooks demonstrated signs of intoxication, Grogan stated that his vitals were good, and he did not seem to be experiencing a medical emergency.  Dkt. No. 54 at 6–8, 78. The circumstances surrounding Brooks's behavior during his initial intake thus do not rise to the level of obviousness such that subjective awareness can be inferred, especially in light of Grogan's determination.  At best, the evidence reflects that Olson acted negligently in initially placing Brooks in the ERC, and negligence is insufficient to support a deliberate-indifference claim.  Moreover, the undisputed evidence indicates that Olson directed that Brooks be placed in the ERC just before his shift ended, so any allegedly unlawful conduct after that point is not properly attributable to him in his individual capacity.  *Id.* at 78. Accordingly, the Court concludes that Olson is entitled to summary judgment as to Count Six based on qualified immunity.

### f.    Spells

Although it is a close call, the Court concludes that Brooks has not produced evidence raising a material-fact dispute as to whether Spells acted with deliberate indifference.  Brooks again claims that this is one of the rare cases where it was obvious to Spells that Brooks needed immediate medical attention because Spells knew Brooks was unable to communicate or repeat his name, and as a sergeant, he had access to Brooks's

inmate file and therefore knew Brooks had been in jail for over two days.  Dkt. No. 53 at
96–97.  In the incident report from March 7, Spells wrote: "[Brooks] attempted to talk to us
but could not complete a whole sentence.  I then attempted to speak with Detainee Brooks
but he couldn't repeat his name to me."  Dkt. No. 54 at 11.  While these facts could lead to
a logical inference that Brooks was exhibiting signs of intoxication, standing alone they are
insufficient to show that it was obvious Brooks needed immediate medical attention.
*See Hines*, 293 F. App'x at 263.

While the facts might show that Spells should have been aware of the risk, the Court
concludes that Brooks has not produced sufficient evidence to show a genuine issue of fact
as to whether Brooks's need for medical attention was so obvious that subjective awareness
can be inferred.  Spells, too, is entitled to qualified immunity as to Count Six.

### g.   Maina

Maina is entitled to qualified immunity.  Somehow, Brooks alleges both that it was
obvious to Maina—the jail's physician assistant—that he faced a medical emergency and
that she never observed Brooks at all.  Dkt. No. 53 at 98–99 ("Defendant Maina was
deliberately indifferent . . . The one thing Maina did do was fabricate a statement that she
attempted to give Brooks medical care.").

According to Maina's interrogatory responses and a letter written on August 22,
2018, Maina and Grogan attempted to conduct a medical examination on Brooks on either
March 7 or March 8.  Dkt. No. 54 at 32, 129.  Maina claims that she wrote the letter in
response to an inquiry about whether she had assessed Brooks.  *Id.* at 32.  She claims that
during the assessment, Brooks acknowledged her presence and followed her movements
with his eyes, but he refused to answer any questions, got aggressive, and attempted to

swing at Grogan.  *Id.*  As a result, she was unable to fully assess him.  *Id.*  Brooks claims that

Maina fabricated the letter in an effort to make it appear as though the jail attempted to

provide Brooks with medical care.  Dkt. No. 53 at 99.  Maina, however, claims that she did

not record the event at the time because a full assessment was not done, and she felt the

patient was mentally and physically stable.  Dkt. No. 54 at 32.  There is a clearly a dispute

as to whether Maina ever examined Brooks.

 If Brooks is correct that Maina never interacted with Brooks or attempted to examine

him, it is not apparent how it would be obvious to her that he was facing a medical

emergency.  Conversely, if Maina did in fact observe Brooks, as she claims, the

circumstances surrounding the alleged interaction do not evidence that she was aware that

Brooks faced a substantial risk of serious harm.  And simply because Maina was responsible

for providing medical care and was possibly present in the jail at some point while Brooks

was there does not make her liable for deliberate indifference.  Because Brooks has not met

his burden of demonstrating a material fact dispute as to whether Maina acted with

deliberate indifference, she is entitled to summary judgment on the basis of qualified

immunity.

### h. Phillips

 Phillips is also entitled to qualified immunity as to Count Six.  The evidence

indicates that Phillips signed two forms: a Personal Property and Clothing form on

March 5, 2018 and a Property Issue Form on March 8, 2018.  *Id.* at 22–24.  On each form,

Phillips indicated that Brooks was unable to sign.  *Id.*  Brooks claims that because Phillips

was aware that Brooks had been at the jail for three days and his physical and mental status

had not changed, Phillips was aware that Brooks needed immediate medical attention.  *Id.*

Even if Brooks has shown that his inability to sign a document after three days would enable Phillips to draw the inference that Brooks was experiencing a medical emergency, he has not demonstrated that Phillips actually drew that inference. And these facts alone, without more, do not demonstrate that the risk was objectively obvious. Accordingly, the Court finds that Phillips is entitled to summary judgment on this claim based on qualified immunity.

### i. Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney

Finally, Brooks has not presented adequate summary-judgment evidence to raise a material-fact dispute over whether Henry, McDonald, Luna, Donnel, Flores, O'Bar, or Chaney acted with deliberate indifference to his medical needs. Brooks does not claim that these officers were actually aware that he faced a substantial risk of serious harm. Dkt. No. 53 at 103–07. Rather, he contends that the substantial risk of serious harm was so obvious to these defendants that their actual awareness can be inferred. *Id.* Brooks's argument and evidence do not support this assertion.

Brooks simultaneously argues that the defendants failed to observe or monitor him at any point and that it was obvious to these defendants that Brooks needed immediate medical attention. *Id.* at 103–06. It is not apparent how a detainee's serious risk of harm could have been obvious to an official who did not actually observe that detainee. But even setting aside Brooks's conflicting positions, he has not demonstrated that it was obvious to each of these defendants that he needed immediate medical care.

Brooks claims these defendants were responsible for monitoring and observing Brooks while he was in solitary confinement between March 9, 2018 and March 13, 2018. The only evidence germane to these defendants is Brooks's declaration, an observation log

from March 6, and a Lockdown Dayroom & Shower Log covering his time in isolation

between March 9 and March 13.  Dkt. No. 54 at 54.  In his declaration, Brooks claims that

while in solitary confinement no jailers checked on him or attempted to help him with

eating, showering, or using the restroom, despite his clear inability to do those things on his

own.  *Id.* at 41.  He further states that during this time he was only allowed to leave his cell

once on March 13, during which time he took a shower while fully clothed.  *Id.*  The log

from this day, which was signed by Chaney, gives a "time in" of 0315, a "time out" of 0415,

and in the place for "inmate's signature" Brooks's name is written in print.  *Id.* at 53.  Based

on the log, Brooks did not receive a shower or use the daytime room at any other point

while in isolation.  *Id.*  Brooks claims that all entries on the shower log other than Chaney's

were fabricated.  Dkt. No. 53 at 27–29. [14]

　　　While these officers knew Brooks was in administrative segregation, absent

additional evidence about their observations or interactions with Brooks, the Court cannot

infer that it was obvious to these defendants that Brooks needed immediate medical

attention.  Moreover, in the Fifth Circuit, a jail employee's failure to abide by a policy

requiring close-watch checks "evinces[,] at best, negligence on the part of" the jail employee.

*Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000); *see also Green v. Harris*

*Cnty.*, No. CV H-16-893, 2019 WL 2617429, at *15 (S.D. Tex. June 26, 2019) ("At most,

---

[14] Officers Gladda and Kilpatrick (who are not defendants in this suit) signed the log stating that Brooks refused to sign and did not leave his cell on March 14, 2018—one day after Brooks was released from the jail.  Dkt. No. 54 at 53.  This means that Gladda and Kilpatrick wrote that Brooks refused to sign even when Brooks was no longer in the jail.  *Id.*  Another officer started to write a note on the log indicating that Brooks spent an hour out of his cell on March 15, 2018—two days after being released from the Taylor County Jail—however, that note was later scratched out.  *Id.* While this may support Brooks's assertion that the logs were fabricated, this dispute does not materially change the analysis on this claim.

such a failure reflects negligence, not deliberate indifference."). This conclusion flows from the established principle that "a prison official's failure to follow prison policies or regulations does not establish a violation of a constitutional right." *Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 369 (5th Cir. 2017).

Based on the summary-judgment evidence, the Court concludes that Brooks has not demonstrated a genuine issue of material fact as to whether defendants Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney acted with subjective-deliberate indifference toward Brooks's substantial risk of serious harm. They are thus entitled to summary judgment on the basis of qualified immunity as to Count Six.

### iii.      A reasonable finder of fact could find that Cronk, Noret, and Vargas were each deliberately indifferent to Brooks's medical needs.

#### a.      Cronk

The Court concludes that Cronk is not entitled to qualified immunity because Brooks has raised genuine a dispute of material fact as to whether Cronk acted with deliberate indifference and whether he violated clearly established law.

Brooks has demonstrated a material-fact dispute as to whether Cronk was aware of a substantial risk of serious harm to Brooks's health. Cronk was involved in removing Brooks from the ERC after his twenty-three-hour overnight stay. Immediately after Brooks was removed from the ERC the first time, Cronk wrote a note stating "Brooks answers a few questions and falls asleep. Placed in holding cell until he is alert enough to be booked in [sic] complete once booked." Dkt. No. 54 at 13, 65. Two days later, Brooks tried to pull away from Cronk, requiring Cronk to use force to regain control of Brooks. *Id.* at 66. Cronk eventually administered a short burst of pepper spray to Brooks's face and ordered that he be placed in the ERC, where he remained for five and a half hours. *Id.*

The evidence also reflects that Mary Brooks spoke to Cronk on multiple occasions while her son was detained. *Id.* at 45, 70. In her declaration, Mary claims that after her visit with her son on March 8, she told Cronk that (1) blood was coming out of Brooks's ear, which could be a possible sign of a brain injury; (2) Brooks asked her if she knew his mother; and (3) she asked Cronk why Brooks could not go to the hospital. *Id.* at 45. If true, these circumstances would have put Cronk on notice that Brooks needed medical care.

Cronk claims that, at the time, he believed Brooks was either under the influence or recovering from the same, and the risk of serious harm was not obvious because Brooks was not complaining of pain and his injuries were limited to the small amount of dried blood in his ear. Dkt. No. 44 at 26–27. He also claims the risk could not have been obvious because Grogan, who assessed Brooks on March 9, did not believe that a substantial risk of serious harm existed. *Id.* at 26. While these assertions may be true, the Court cannot make credibility determinations or weigh the evidence at this stage. *Reeves*, 530 U.S. at 150. And the record reflects not only that Cronk knew Brooks's condition had not improved over the course of several days, but that he told Mrs. Brooks that the medical staff was aware of the situation and responsible for deciding whether to take him to the hospital, indicating he knew there was a possibility that Brooks needed care. Dkt. No. 54 at 70. Viewing the evidence in the light most favorable to Brooks, the Court concludes that Brooks has raised disputes of material fact as to whether Cronk was aware, because it was obvious, that Brooks needed immediate medical attention.

And, viewing the evidence in the light most favorable to him, Brooks has also raised a material-fact dispute as to whether Cronk acted in reckless or wanton disregard of the risks Brooks faced by failing to investigate further or obtain medical care. *See Domino*, 239 F.3d

– 43 –

at 756; *Stewart*, 174 F.3d at 537; *see also Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979)
("There is a vast difference between an earnest, albeit unsuccessful attempt to care for a
prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man
who is obviously in desperate need of help."). Brooks has met his burden on the first prong
of qualified immunity as to Cronk.

### b.    Noret

Brooks has likewise raised a genuine dispute of material fact as to whether Noret
acted with deliberate indifference. Brooks claims that Noret was aware, because it was so
obvious, of a substantial risk of serious harm to Brooks.

There is no evidence that Noret directly interacted with Brooks. But she admits to
being aware of his situation based on conversations with other jailers and with Mary
Brooks. The Court therefore must determine whether those conversations gave Noret
sufficient information to lead to an inference that she knew Brooks needed immediate
medical care because the need was obvious.

When Mary visited the jail on March 8, she spoke with Noret, whom she had known
since childhood, to try to understand what was going on with her son. Dkt. No. 54 at 44,
89. When Mary asked to see her son, Noret told her that her son had gotten ahold of some
bad drugs and that it would take a few days for him to come down. *Id.* at 45. She also said
that she would not want to see him in the condition he was in. *Id.* Mary eventually saw her
son. Based on that conversation, Mary told Noret that there was something seriously wrong
with him and warned Noret that he could possibly have a brain injury. *Id.* at 46.

There is conflicting testimony on whether Noret acted with deliberate indifference.
Mary claims that Noret did nothing in response to her complaints; Noret claims that she

requested a medical evaluation of Brooks and that her superior—a captain—was present during most of her conversations with Mary. *Id.* at 46, 88–89. Because there is a dispute as to whether Noret failed to solicit medical attention or the guidance of a supervisor, there is a dispute of material fact that the Court cannot resolve at the summary judgment stage.

On this record, a reasonable trier of fact presented with this evidence and Noret's knowledge that Brooks's condition had not improved by his third day in detention could find that Noret was aware of facts that supported an inference that Brooks faced a substantial risk of serious harm, that she actually drew such an inference given how obvious his medical needs were, and that she wantonly disregarded those needs. Brooks has thus satisfied the first prong of qualified immunity.

c.    **Vargas**

A material-fact dispute exists as to whether Vargas acted with deliberate indifference. Vargas attempted to conduct a medical intake of Brooks on March 6. Dkt. No. 54 at 26, 93. Vargas was aware that Brooks had not communicated with staff since his arrival the prior day. *Id.* In her declaration, Mary Brooks indicates that, on March 8, she spoke by phone with Vargas about her visit with her son. *Id.* at 46–47. Mary claims she told Vargas that something was seriously wrong with Brooks, and she demanded that he be taken for medical care, while offering to pay for his transportation to the hospital. *Id.* at 47. She claims that in response, Vargas told her that she could not demand anything, that Brooks was just drunk and high, and then hung up. *Id.* Mary claims that Vargas, despite knowing the risks, ignored her complaints and did nothing to provide Brooks with medical care. *Id.* at 47, 7. Vargas recalls speaking with Mary, but she cannot recall the substance of their conversations. *Id.* at 94.

– 45 –

That same day, Vargas completed the Classification Notice for Brooks before having it reviewed by another officer.  *Id.* at 28.  Following this classification, Brooks was housed in administrative segregation (solitary confinement); he claims he was left there to heal until his release on March 13 without any medical attention.  Dkt. No. 53 at 95.  But a dispute of material fact exists between Brooks's alleged confinement and the confinement Vargas claims to have ordered.  The classification report provides no explanation for Brooks's assignment to solitary confinement; it states only that Brooks's classification was "Minimum Pre-Sentence."  Dkt. No. 54 at 28.

Vargas claims that she could not have been aware of a substantial risk of serious harm because she believed that Brooks's medical needs were properly addressed by Grogan, the facility's duty nurse.  Dkt. No. 45 at 31.  While this may be true, Brooks has furnished at least some evidence indicating that Vargas was subjectively aware that he needed immediate medical assistance because it was obvious and that she subsequently acted with deliberate indifference by failing to ensure Brooks received medical care.  Viewing that evidence in the light most favorable to Brooks, the Court concludes that summary judgment for Vargas is barred by the existence of a material fact dispute as to whether she was deliberately indifferent to his serious medical needs.

> **iv.    At the time, deliberate indifference of the type Brooks alleges was clearly unlawful.**

Turning to the second prong of qualified immunity, the Court must determine "whether there are genuine disputes of material fact as to whether 'the unlawfulness of the [officers'] conduct was 'clearly established at the time.'"  *Dyer*, 964 F.3d at 383 (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019)).  The fundamental question is whether—viewing the evidence in the light most favorable to Brooks—Cronk, Noret, and Vargas would have

– 46 –

had "fair notice" that their actions were unreasonable. *Hope*, 536 U.S. at 741. "Although a case directly on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful." *Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017).

As a pretrial detainee, Brooks had a clearly established right "'not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer*, 964 F.3d at 380 (quoting *Thompson*, 245 F.3d at 457). And at the time Cronk, Noret, and Vargas allegedly denied Brooks medical care, the law was clearly established that a detainee could demonstrate a constitutional violation by showing that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (quoting *Domino*, 239 F.3d at 756); *see also Delaughter*, 909 F.3d at 140 ("[I]t is clearly established that delaying medical care can constitute [deliberate indifference] if the prion official 'knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it,' and the delay results in substantial harm." (cleaned up)).

Brooks cites to the Fifth Circuit's decision in *Fielder v. Bosshard* for support. 590 F.2d 105, 108 (5th Cir. 1979). In *Fielder*, jail staff knew the detainee was suffering from delirium tremens, and they ignored the detainee's erratic behavior and moaning for a doctor for several hours before finding him dead in his cell. *Id.* at 105. Notably, in *Fielder*, the detainee's mother had also informed one of the jailers that Fielder was sick, that he had a virus and high blood pressure, that he had not eaten, and that he needed attention. *Id.* at 107. The Fifth Circuit affirmed the jury's finding that the officers acted with deliberate

indifference because they appreciated the "extremity of [the detainee's] illness" and took no action and even exhibited hostility towards the inmate. *Id.* at 108 (explaining that the jury's finding in light of the instructions indicated that it found more than negligence and that the jailers' behavior "crossed the line between misfeasance and conscious cruelty").

As in *Fielder*, Brooks was exhibiting erratic behavior and was unable to communicate with his jailers. 590 F.2d at 108. And just as the detainee in *Fielder* showed no improvement over the course of his detention, Brooks's symptoms persisted each day he was detained. *Id.* Unlike Fielder, however, Brooks did not himself request to see a doctor; however, his mother informed jail personnel that Brooks needed medical attention.[15] *Id.* at 107. Given the striking similarities between the two scenarios, *Fielder* bolsters the conclusion that Cronk, Vargas, and Noret had fair notice that taking no action in response to a known risk of serious harm constituted deliberate indifference.

Brooks also relies on the Fifth Circuit's decision in *Montano v. Orange County* to claim that the officers were on notice that their conduct violated clearly established law. 842 F.3d 865 (2016). The Fifth Circuit summarized the facts of *Montano*:

> [J]ail staff had left a severely intoxicated detainee alone in a cell for over four days, with his own excrement and the food he refused to eat, while they expected he would eventually sober up. He died of acute renal failure after his calls for assistance went unanswered. Montano had arrived at the jail so intoxicated that he was unable to answer the officer's intake questions, and the officers ignored obvious signs of his physical deterioration over a period of days.

*Est. of Bonilla v. Orange County*, 982 F.3d 298, 307 (5th Cir. 2020) (citations omitted). The *Montano* Court affirmed a jury's finding on the condition-of-confinement claim that the

---

[15] And, given that Brooks could barely speak and could not recognize his mother, expecting him to self-diagnose and request treatment would be unreasonable.

county had a de facto policy of placing seemingly-intoxicated pretrial detainees in a room, without appropriate medical care, to "sober up," which constituted punishment in violation of the Fourteenth Amendment. *Montano*, 842 F.3d at 870–72.

But *Montano* is meaningfully different. Just as in *Montano*, Brooks was incoherent and unable to complete the booking process. Moreover, there is at least some evidence that Cronk, Noret, and Vargas ignored signs of his physical deterioration over a period of days. *Montano* is distinguishable, however, because the plaintiffs there did "not challenge 'the acts or omissions of individuals but the jail's system of providing medical care' to detainees who were seemingly detoxifying." 842 F.3d at 876 (quoting *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 453 (5th Cir. 2009)).[16] And here, unlike in *Montano*, Brooks was not placed in isolation at the outset and left unattended to heal for days on end. *Id.* at 878. Rather, the evidence indicates that Brooks was placed in different cells during his first five days at the jail; spent time in the ERC on three different occasions; was permitted to visit his mother on March 8; and was eventually placed in isolation on March 9, where he stayed until his release on March 13. Brooks also received a medical examination at least once during this period. Given these differences, Brooks's citation to *Montano* is unavailing.

Nevertheless, viewing the summary-judgment evidence in the light most favorable to Brooks, Cronk, Noret, and Vargas ignored obvious signs that Brooks was not improving over a period of days, as well as warnings from Mary Brooks that her son was acting

---

[16] The Court addresses this distinction in greater detail below, *see infra* at 4.C.i.

bizarrely and in a manner consistent with a brain injury. [17]  A reasonable jury could find

that, based on observations or knowledge that a detainee's condition has not improved over

a period of three days, combined with complaints from his mother that he was confused and

may have brain damage, all reasonable officers would have called for supplemental and

prompt medical assistance or evaluation, or taken other reasonable measures to abate the

risk of serious harm.  In short, there is some evidence that no reasonable official could have

believed such conduct was lawful in light of clearly established law, *cf. Sims v. City of Jasper*,

No. 1:20-CV-124, 2021 WL 2349350, at *9 (E.D. Tex. June 9, 2021) (citing *Easter*, 467 F.3d

at 465), and because there is some evidence that Cronk's, Noret's, and Vargas's conduct was

not objectively reasonable, the Court concludes that they are not entitled to summary

judgment based on qualified immunity as to Count Six.  *See id.* (citing *Easter*, 467 F.3d at

465).

### C.    Count One:  Solitary Confinement

Count One of Brooks's First Amended Complaint alleges that various officers

violated his constitutional rights by placing him in solitary confinement—a condition of

confinement tantamount to punishment, he says.   Dkt. No. 28 at 36–38.  Such confinement

was, according to Brooks, pursuant to a de facto policy of placing intoxicated detainees in

---

[17] The defendants misapprehend Brooks's claim.  They repeatedly highlight the conditional language
in the affidavit provided by Dr. Edelman—the attending neurosurgeon who evaluated Brooks upon
his arrival at the hospital.  *E.g.*, Dkt. No. 61 at 11 ("Dr. Edelman only opines that the condition was
**potentially** serious and would require **potential** treatment.") (emphasis in original).  Moreover, and
more concerningly, the defendants omit the portion of Dr. Edelman's affidavit that says that the
symptoms Brooks exhibited "require immediate evaluation."  Surely the defendants acknowledge
that one cannot know the severity of any injury nor the extent of any treatment required unless and
until there is an evaluation by a physician, which is what Brooks claims he was improperly denied.
Dr. Edelman's statements—conditional though they may be—are fully consistent with the
conclusion that preventing Brooks from being thoroughly evaluated was objectively unreasonable
under clearly established law.

isolated confinement until they were coherent, which Brooks claims served no legitimate governmental interest and caused a violation of his constitutional rights.  Dkt. No. 53 at 30–46.  Brooks also alleges that his confinement and functional abandonment were done "only to punish [him] for having serious medical symptoms."  Dkt. No. 28 ¶ 198.

Preliminarily, all of the defendants argue that Brooks mischaracterizes Count One as a conditions-of-confinement claim.  The defendants argue that, because his allegations are based on the particular acts or omissions of individual officers, Count One is best characterized as an episodic deliberate-indifference claim.  Dkt. No. 45 at 16.  Brooks does not respond to that argument; he maintains that the County had an arbitrary and purposeless de facto policy of placing intoxicated detainees in isolated confinement until they were coherent.  Dkt. No. 53 at 39–46.  The distinction matters, though.

### i.       Conditions of confinement v. episodic acts or omissions

Two types of claims coexist to vindicate a pretrial detainee's rights: the conditions-of-confinement claim and the episodic-acts-or-omissions claim.  *E.g.*, *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).  A conditions-of-confinement claim "is a constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement."  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) (quoting citing *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)).  "Because a state may not punish a pretrial detainee, conditions of confinement for [a pretrial] inmate that amount to 'punishment' violate the Constitution."  *Duvall v. Dallas Cnty.*, 631 F.3d 203, 206 (5th Cir. 2011).  Circumstances like the number of bunks in a unit or the restriction of mail privileges are challenged through a conditions-of-confinement claim.  *Moore*, 114 F.3d at 53 & n.2.

– 51 –

To succeed on a conditions-of-confinement claim, a detainee must prove (l) a rule or restriction, an intended condition or practice, or a de facto policy as evidenced by sufficiently extended or pervasive acts of jail officials; (2) that is not reasonably related to a legitimate governmental objective; and (3) that resulted in a violation of his constitutional rights. *Duvall*, 631 F.3d at 207 (citing *Hare*, 74 F.3d at 645). A condition of confinement lacks a reasonable relationship to a legitimate governmental objective if it is "arbitrary or purposeless." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009) (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)). But because we assume that the State acts intentionally, a plaintiff need not show that the intent behind a rule or restriction—explicit or de facto— was meant to punish the defendant; the result is enough. *Hare v. City of Corinth*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc).

Nevertheless, succeeding on a conditions-of-confinement claim is more difficult when that claim rests upon an alleged de facto, rather than explicit, policy. To do so, a detainee must demonstrate "that one or more jail officials' 'acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice.'" *Nagle v. Gusman*, No. CV 12-1910, 2016 WL 768588, at *9 (E.D. La. Feb. 26, 2016) (quoting *Est. of Hensen v. Wichita Cnty.*, 795 F.3d 456, 465 (5th Cir. 2015)). "Showing a pervasive pattern is a heavy burden." *Sanchez v. Young Cnty.,* 956 F.3d 785, 793 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020) (citation omitted). A plaintiff may establish a de facto policy by presenting evidence such as commissioned reports, consistent employee testimony, or "other documentary evidence indicating inmates received 'grossly inadequate' treatment." *Montano*, 842 F.3d at 875. "[W]hen multiple employees act in the same unconstitutional manner, that is indicative of a

de facto city policy." *Sims*, 2021 WL 2349350, at *13 (citing *Sanchez*, 956 F.3d at 793).  The

Fifth Circuit has suggested that condition-of-confinement claims brought against an

individual may only be brought against that person in her official capacity.  *E.g.*, *Est. of*

*Allison v. Wansley*, 524 F. App'x 963, 970 n.4 (5th Cir. 2013); *see also Nagle*, 2016 WL 768588,

at *5 (collecting cases).

    An episodic-acts-or-omissions claim, on the other hand, stems from a one-off event,

like an assault by a jailer.  A plaintiff in an episodic claim typically sues both the perpetrator

and the governmental entity responsible for supervising the perpetrator: the entity, so the

claim goes, is derivatively liable because it failed to implement policies that would have

prevented the allegedly intolerable act.  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

When an individual is sued, the question becomes whether that officer breached his

constitutional duty to "tend to the basic needs of persons in his charge."  *Hare*, 74 F.3d at

645.  But unlike in a conditions-of-confinement claim, where the court assumes the State

acted intentionally to punish a detainee, a plaintiff suing an individual defendant must

demonstrate that the officer acted with deliberate indifference to those basic needs.

    While both scenarios require proving deliberate indifference, the mens rea a plaintiff

must prove in an episodic-acts-or-omissions claim depends on whether the defendant is sued

in his individual or official capacity.  Suits against a defendant acting in his official capacity

are, at bottom, an attempt to recover from the governmental entity itself, while suits against

a defendant in his individual capacity seek to recover from the defendant personally.  *Hafer*

*v. Melo*, 502 U.S. 21, 25 (1991).  Accordingly, if the defendant is being sued in his official

capacity, the plaintiff must show that the defendant's acts flowed from a municipal policy or

practice that was adopted or perpetuated with objective deliberate indifference to the risks to

the plaintiff's wellbeing. Determining objective deliberate indifference requires looking not just to what the defendant did know, but what she should have known, too. Meanwhile, subjective deliberate indifference is required if the plaintiff seeks to recover from a defendant in her individual capacity. With subjective deliberate indifference, what the defendant should have known is irrelevant: all that matters is whether the defendant disregarded a known and substantial risk to the defendant's wellbeing. Subjective awareness can, however, be inferred if the risk of harm is "obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

None of this is mutually exclusive. A plaintiff may plead both conditions-of-confinement and episodic-acts-or-omissions theories in the alternative as to a particular set of facts, and district courts need not restrict their analysis to one theory. *See, e.g.*, *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 462–64 (5th Cir. 2015). Indeed, rare cases exist where a plaintiff's allegations support both theories of recovery. *See, e.g.*, *Sabbie v. S.W. Corr., LLC*, No. 5:17-CV-113-RWS-CMC, 2019 BL 477152, at *43 (E.D. Tex. Mar. 6, 2019) (citing *Montano v. Orange Cnty.*, No.1:13-CV-00611, 2015 WL 11110596, at *3 (April 13, 2015 E.D. Tex.), *aff'd in part, vacated in part, remanded by Montano v. Orange Cnty.*, 842 F.3d 865 (5th Cir. 2016)).

### ii.      Analysis

Brooks maintains that Count One is a conditions-of-confinement claim. In support of his framing, Brooks cites again to *Montano v. Orange County*, 842 F.3d 865. Dkt. No. 53 at 40–43. Recall that in *Montano*, officials suspected a pretrial detainee was intoxicated. After four days with little food or water, one rudimentary medical evaluation, and no attention from a physician, the detainee died of acute renal failure. 842 F.3d at 869. Jail employees

consistently testified at trial that "the jail's explicit custom was to isolate seemingly-intoxicated detainees in the bubble, and to leave them there until either they became coherent and could be booked, or a contract physician visited." *Id.* at 876.  On appeal, the Fifth Circuit held that "[g]iven the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a de facto policy for conditions or practices." *Id.*

A more recent case, *Sanchez v. Young County*, presented similar facts.  956 F.3d 785, 794 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020).  Officials at the Young County jail—which had a history of serious problems—failed to comply with established policies or heed multiple warnings that a pretrial detainee was a risk to herself, and the worst came to pass. *Id.* at 787–89.  The Fifth Circuit held that that there were genuine factual disputes as to whether the county had a de facto policy of failing to monitor and assess pretrial detainees' medical needs where at least three jailers "testified that the jail's protocol with highly intoxicated detainees is to place them in holding cells to 'sleep off' their apparent intoxication before completing book-in." *Id.* at 794.

But, to defendants' point, both *Montano* and *Sanchez* involved condition-of-confinement claims against counties rather than individual officers.  The defendants are correct that, when a Fourteenth Amendment condition-of-confinement claim is based on a de facto policy, the claim is generally asserted directly against municipalities or officers in their official capacities—not against the involved officers in their individual capacities.

Here, however, Brooks's Complaint is not a model of clarity.  There is no statement one way or the other as to whether Count One seeks to hold Taylor County or the officers personally liable.  But a number of signs indicate that Count One is brought against the

officers in their individual capacities.  Count Seven is brought against "Taylor County and [Sheriff] Bishop (in his official capacity)," a parenthetical not found in Count One.  *Compare* Dkt. No. 28 at 64 *with* Dkt. No. 28 at 36.  Count Seven likewise seeks recovery from the County for many of the same harms allegedly caused by the conduct alleged in Count One, suggesting that the two seek recovery from different pots.  *Compare* Dkt. No. 28 ¶¶ 370, 372, 375, 380, 382 (Count Seven) *with* Dkt. No. 28 ¶¶ 191, 195, 196, 198, 200, 202 (Count One). Count Six, meanwhile, is a deliberate-indifference claim brought against "All Individual Defendants," but omits Sheriff Bishop.  *See* Dkt. No. 28 at 73–77.  And in his prayer, Brooks seeks "punitive damages" from the "Individual Defendants," which Count Six defines to include those against whom Count One is brought.  Dkt. No. 28 ¶ 437.  Of course, punitive damages are not available against a municipality in a Section 1983 suit.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  All of this leads the Court to conclude that Count One is brought against the named officers in their individual, rather than their official capacities.

That conclusion counsels against construing Count One as a conditions-of-confinement claim, as Brooks urges.  But, out of an abundance of caution, the Court will evaluate Count One as both a conditions-of-confinement claim against the municipality vis-à-vis the officers and as an episodic-acts-or-omissions claim against the officers in their individual capacities.[18]

---

[18] The defendants argue that Count One is best construed as an episodic-acts-or-omissions claim and present argument as to why they are entitled to qualified immunity regardless of how the Court construes Count One.  Dkt. No. 45 at 16 ("Count 1 constitutes an episodic act or omission claim. . . . Plaintiff fails to address deliberate indifference whatsoever in Count 1. . . . Accordingly, Plaintiff has failed to satisfy its burden.").  Thus, there can be no prejudice to defendants from the Court's alternative analysis.

### iii. Vargas

Brooks claims that Vargas's decision to place him in solitary confinement on March 9 violated his constitutional right to be free from pretrial punishment. If Count One is a conditions-of-confinement claim, that claim fails, and Vargas is entitled to summary judgment on the basis of qualified immunity as to Count One. But if it is an episodic-acts-or-omissions claim, as the defendants urge, Brooks has demonstrated a genuine dispute of material fact as to whether Vargas violated his clearly established rights.

### a. There is no evidence that Vargas acted pursuant to any policy when she placed Brooks in solitary confinement.

According to Brooks, Vargas placed him in isolated confinement on March 9 because of his apparent intoxication. To prevail on a conditions-of-confinement claim based on Vargas's conduct, Brooks must show that Vargas acted pursuant to a rule, restriction, or pervasive practice not reasonably related to a legitimate governmental objective. *See, e.g.*, *Sanchez*, 956 F.3d at 791.

But Brooks offers no evidence as to what Vargas's motivation or reasoning was. Brooks points to the classification report prepared at the time he was placed in solitary confinement, but the report does not specify the reason for his placement. Dkt. No. 53 at 95; Dkt. No 54 at 28. Neither do Vargas's interrogatory responses. Dkt. No. 54 at 94. So while it is possible that Vargas designated Brooks for administrative segregation pursuant to some policy of segregating the seemingly intoxicated, Brooks has not presented evidence to support this inference. The Court cannot draw the conclusion Brooks urges without proper evidentiary support—support absent here.

What evidence Brooks has mustered pales in comparison to that offered in *Montano* and *Sanchez*.[19] There, multiple officers consistently testified that there was a de facto policy of placing detainees in isolation until they were sober and coherent. Here, too, there is consistent evidence, just not of the sort that is helpful to Brooks's case. Each interrogatory response relevant to the issue indicated that "no inmate is denied medical care simply because they are intoxicated, and if an inmate is believed to be intoxicated, a supervisor is notified, and the inmate is assessed and monitored." *See, e.g.*, Dkt. No. 54 at 94–95. This evidences not a de facto policy of placing seemingly intoxicated detainees in isolation, but the opposite.

Brooks's claim therefore fails at step one. Taking what little evidence exists in the light most favorable to Brooks, the Court concludes that there is no genuine dispute of material fact as to whether Vargas was acting pursuant to a county policy—de facto or otherwise—of isolating the inebriated when she placed Brooks in solitary confinement on March 9. The uncontroverted evidence is that she was not.

### b.   But Vargas may have been aware of Brooks's injuries when she did so.

Brooks fares better if Count One is recast as an episodic-acts-or-omissions claim. Proceeding against defendants in their individual capacities, a plaintiff must show subjective deliberate indifference to the plaintiff's basic human needs. *E.g.*, *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). The Court has already concluded that Brooks has raised a genuine

---

[19] Moreover, the authorities Brooks cites are distinguishable on their facts. Unlike *Montano* and *Sanchez*, Brooks's claim against Vargas challenges not the procedures or actions taken when Brooks first arrived at the Taylor County Jail, but Vargas's decision to place him in solitary confinement four days later. Dkt. No. 54 at 28. If Taylor County had a policy of segregating the intoxicated, as Brooks alleges, the four-day delay in placing Brooks in solitary confinement would seem to seriously undermine the efficacy of that policy.

dispute of material fact as to whether Vargas was subjectively and deliberately indifferent to Brooks's needs, including when she designated him for solitary confinement, in violation of clearly established law. *See supra* at 4.B.iii.c. Accordingly, if Count One is an episodic-acts-or-omissions claim, Vargas is not entitled to summary judgment.

### iv.     The monitoring officers are entitled to qualified immunity.

Count One also alleges that defendants Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney violated Brooks's rights by failing to monitor him or provide him with medical care while he was in isolation. Even if Brooks can press his conditions-of-confinement claim against these officers in their individual capacities—which, as explained above, is a dubious proposition—he cannot carry his burden to show that the officers engaged in a pervasive pattern of deficiencies in providing for his basic needs while under their supervision. Nor has Brooks offered any evidence that these officers were aware of his need for medical attention while he was in solitary confinement. So regardless of how the Court construes Count One, Brooks has failed to carry his burden as to these officers, and they are entitled to summary judgment.

#### a.     Brooks offers no evidence that these officers acted pursuant to a policy or practice.

A condition of confinement violates the Constitution when it results in "serious deficiencies" in a detainee's "basic human needs." *Shepherd*, 591 F.3d at 454. Proving such a violation based on an allegedly pervasive practice requires showing that a municipal policy was the motivating force behind the practice. *Sanchez*, 956 F.3d at 791. Brooks urges the Court to infer the existence of such a practice from the monitoring officers' failure to furnish him with adequate medical care while he was in solitary confinement. Dkt. No. 53 at 42–46; Dkt. No. 28 ¶¶ 180–85. But, just as with Vargas, Brooks offers no evidence of any

policy or practice that led to the defendants' actions.  Accordingly, if the Court construes

Count One as a conditions-of-confinement claim, Brooks has failed to carry his burden as to

these defendants, and they are entitled to summary judgment.

> **b.    And there is no evidence that these officers knew about Brooks's medical condition.**

Here, too, Brooks's argument falters at the outset.  Brooks has not introduced

evidence indicating that any of these individual officers knew that he needed medical care

while in isolation.  It is uncontroverted that defendant Grogan—the jail's nurse—conducted

a medical examination on Brooks the day he was placed in administrative segregation.  Dkt.

No. 54 at 30.  Likewise, Brooks offers no evidence indicating that these defendants believed

him to be so intoxicated or injured such that a jury could reasonably infer that these

individuals had a pervasive practice or policy of depriving "highly intoxicated [or injured]

individuals of essential medical care."  *Sims*, 2021 WL 2349350, at *14 (citing *Sanchez*,

956 F.3d at 791).  Because an inference must be based on something and here there is

nothing, the Court cannot infer that any alleged failure to provide medical care

demonstrated a pervasive pattern of unconstitutional conduct on the part of the monitoring

officers.

Additionally, Brooks has not demonstrated that the defendants' failure to monitor

him equated to a failure to meet his basic human needs.  Brooks references a Lockdown

Dayroom & Shower Log in his response, which appears to record once-daily checks on

Brooks while he was in isolation.  Dkt. No. 53 at 42–46.  Brooks claims that all but one of

the Log's entries are fabrications—that he was not eating, using the bathroom, showering,

or leaving his cell while in isolation.  *Id.*  As a practical matter, though, Brooks has not

shown that these officers were actually responsible for monitoring him throughout his time

in isolation more than once per day.  And to the extent the Court can infer from the Log that they were responsible for his welfare while in solitary, Brooks has not shown that any of these officers knew that he was not eating or using the bathroom.  Indeed the entire thrust of Brooks's argument is that the officers never checked on him at all.  How the officers could both not observe Brooks and simultaneously be aware that he was not eating, showering, and the like is unresolved.

Even if that were the case, Brooks has not demonstrated that the failure to monitor or observe a pretrial detainee without any known symptoms or medical needs constitutes punishment in violation of the Fourteenth Amendment.  *See Est. of Bonilla*, 982 F.3d at 311 (affirming qualified immunity where the plaintiff exhibited no signs of intoxication, suicidal tendencies, or symptoms of withdrawal, and where there was no evidence or consistent jailer testimony to support plaintiff's theory of municipal liability).

Regardless of how the Court approaches the question and despite taking the evidence in the light most favorable to him, Brooks has failed to raise a genuine issue of material fact as to Count One against Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney. These defendants are therefore protected by qualified immunity and entitled to summary judgment on this claim.

*          *          *

As to all but Vargas, then, the ambiguity in Brooks's pleadings and briefing is irrelevant: the defendants would be entitled to summary judgment either way.  Mindful of the Court's obligation to construe pleadings so as to do justice, *see* Fed. R. Civ. P. 8(e), and aware that the defendants responded on the merits to Count One as an episodic-acts-or-omissions claim, the Court concludes that Count One represents an episodic-acts-or-

omissions claim against the defendants.  As a result, the analysis as to Vargas is the same for Count One as it is to Count Six.  And as she is not entitled to summary judgment on the basis of qualified immunity as to Count Six, neither is she entitled to summary judgment as to Count One.

### D.    Bystander Liability

Although they may not have participated in a constitutional violation, the defendants may be liable under Section 1983 if they were aware of an ongoing constitutional violation, had an opportunity to intervene to stop the violation, and chose not to do so—a bystander theory of liability.  Brooks alleges in Count Eight that each defendant was a bystander to the harms he suffered.  Dkt. No. 28 at ¶¶ 412–31.

"[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"  *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).  "However, liability will not attach where an officer is not present at the scene of the constitutional violation."  *Id.* (citations omitted).  The primary focus is on whether the bystander officer has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it."  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  Although bystander liability "most often applies

in the context of excessive force claims, other constitutional violations also may support a theory of bystander liability." *Whitley*, 726 F.3d at 646 n.11 (citations omitted).[20]

### i.     Excessive Force

Brooks asserts that Olson, Miller, Elrod, O'Connor, Grogan, Horton, Spells, and Cronk were present and failed to protect Brooks from excessive force by others.  Dkt. No. 53 at 107–09.  Additionally, he claims that "this is an obvious case where the obvious cruelty inherent in the Taylor County Individual Defendants' conduct should have provided them with some notice that their alleged conduct violated Brooks' constitutional protection under the Fourteenth Amendment."  Dkt. No. 53 at 108; *cf. Hope*, 536 U.S. at 745.

A bystander-liability claim stemming from the use of excessive force turns on whether the bystander has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it."  *Hale*, 45 F.3d at 919.  Mere presence at the scene of alleged use of excessive force, however, does not give rise to bystander liability.  *See Whitley*, 726 F.3d at 646–47; *Vasquez v. Chacon*, No. 3:08-CV-2046-M, 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009) (citing *Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001), *aff'd* 390 F. App'x. 305, 2010 WL 3023273 (5th Cir. 2010)).  Making this determination involves consideration of both the duration of the alleged use of force and the location of the detainee relative to the bystanders.  *See generally Vasquez*, 2009 WL 2169017, at *6.

---

[20] The Court notes that both cases *Whitley* cites in support of this proposition are excessive-force claims.  *See Richie v. Wharton Cnty. Sheriff Dep't STAR Team*, 513 F. App'x 382, 386 (5th Cir. 2013) ("The summary judgment evidence established that the officers' conduct did not involve the excessive or unnecessary destruction of property and that any damage was incidental to the execution of the warrant") *and Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Anderson and Grubb argue that the district court's jury instructions with regard to their excessive force claim constituted plain error.").

Only those officers a jury could conclude were present at the time of the alleged excessive force can be held liable under a bystander theory of liability. The problem for Brooks is that he does not present any competent summary-judgment evidence as to who—other than those officers discussed in relation to Counts Three, Four, and Five, *see supra* at 4.A—was present when excessive force was allegedly used against him.

Brooks alleges, without support, that Olson, Phillips, Vargas, Grogan, Horton, Noret, Spells, Maina, Henry, McDonald, Luna, Donnel, Flores, O'Bar, Chaney, Miller, and O'Connor[21] were aware of the pepper spray on his face while he was confined to the ERC for the second time, and yet they did nothing. Dkt. No. 28 ¶ 427. The uncontroverted evidence is that Elrod and Smurphat were present around the time Cronk sprayed Brooks with pepper spray. Dkt. No. 54 at 66. But Brooks presents no other evidence of who was present during Brooks's second stint in the ERC.

Brooks also alleges that each of the individual defendants were bystanders to his prolonged and purposeless restraint in the ERC. Dkt. No. 28 at ¶ 426. As discussed above, Brooks has carried his burden to survive summary judgment as to Spells, Cronk, Elrod, and Smurphat as to his excessive force claims against them. So long as at least one of them is found directly liable, a reasonable jury could therefore find that, rather than violating Brooks's rights directly, Spells, Cronk, Elrod, or Smurphat did so as a bystander. But Brooks has not offered sufficient evidence to support the conclusion that Olson, Phillips, Vargas, Grogan, Horton, Noret, Maina, Henry, McDonald, Donnel, Flores, O'Bar, or Miller were present during, let alone aware of, Brooks's prolonged detention in the ERC.

---

[21] All claims against Woods and Wheeler have been conceded, Dkt. No. 53 at 39 n.2. Summary judgment will be entered in their favor as to the Counts against them—Counts Six and Eight as to Woods and Counts One and Eight as to Wheeler.

Floor Observation Logs submitted by Brooks do note that Chaney, Luna, and O'Connor observed Brooks while confined to the ERC in the early morning of March 6 during his 23-hour stint. Dkt. No. 54 at 136–37. O'Connor's name appears just once on the log. *Id.* at 137. Given that the nature of Brooks's excessive force claim turns on the length and purposelessness of his confinement to the ERC, and lacking evidence that O'Connor was a supervisor empowered to release Brooks from the ERC, a reasonable jury could not conclude from one observation alone that O'Connor was either aware of the ongoing constitutional violation or in a position to remediate it. Luna's name appears on the log four times. *Id.* at 136. As with O'Connor, a reasonable jury could not conclude from those limited entries over a span of just ninety minutes that Luna is liable as a bystander. Chaney's name, on the other hand, appears 19 times over three hours. But while a reasonable jury might conclude that Chaney was aware of the ongoing violation, Brooks offers no evidence that Chaney was in a position to release Brooks. And because the opportunity to intervene is a prerequisite to a finding of bystander liability, Brooks's bystander claim fails as to Chaney, too. *Hale,* 45 F.3d at 919.

Brooks's unsupported and conclusory assertions that Olson, Phillips, Vargas, Grogan, Horton, Noret, Maina, Henry, McDonald, Donnel, Flores, O'Bar, Miller, O'Connor, Luna, or Chaney "made the conscious decision not to" intervene to prevent the use of excessive force against him do not suffice to defeat these defendants' motion for summary judgment.

### ii.     Deliberate Indifference

Brooks contends that all the Taylor County individual defendants were aware that other officers and nurses were violating Brooks's constitutional rights under the Fourteenth

Amendment by failing to provide him with medical attention.  Dkt. No. 28 at ¶ 417.  Brooks claims that each individual defendant had the ability to contact an ambulance or medical provider or to transport him to the hospital.  Dkt. No. 53 at 108.  Brooks claims that the defendants are therefore liable under a bystander theory of liability for deliberate indifference.  Dkt. No. 53 at 107–110.

It is unclear to the Court that such a theory of recovery even exists.  Bystander liability is predicated upon a defendant's presence at the scene of constitutional violation.  But being a bystander to deliberate indifference is just deliberate indifference.  If a defendant (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act, that defendant necessarily (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and (2) actually drew that inference.  There is no difference between being a bystander to deliberate indifference and being deliberately indifferent.  Given the congruity of the legal theories proposed in Counts Six and Eight, the Court denies Cronk, Noret, and Vargas summary judgment as to Count Eight for the same reasons as Count Six, *see supra* at 4.C.iii[22]  But even if such a claim were possible, Brooks has not presented sufficient evidence for a jury to conclude that any of the defendants but Cronk, Noret, and Vargas were aware of an ongoing constitutional violation, *see supra* at 4.B.ii, so summary judgment in those defendants' favor is appropriate.

---

[22] At this stage, the Court is resolving solely whether the defendants are entitled to qualified immunity.  This order does not prevent Cronk, Noret, and Vargas from challenging, if they so choose, the legal viability of the bystander theory of liability for deliberate indifference presented against them in Count Eight through another motion or pretrial filing.

Brooks has not met his burden to defeat summary judgment on the issue of deliberate indifference as to defendants Smurphat, Olson, Phillips, Elrod, Grogan, Horton, Spells, Maina, Henry, McDonald, Luna, Donnel, Flores, O'Bar, and Chaney. Because the claims are identical, they are likewise entitled to summary judgment as to Brooks's deliberate-indifference bystander-liability claim.

*                *                *

In sum, viewed in the light most favorable to Brooks, the admissible summary judgment evidence compels summary judgment for defendants Olson, Phillips, Grogan, Horton, Maina, Henry, McDonald, Luna, Donnel, Flores, O'Bar, Miller, O'Connor, and Chaney as to Count Eight. But because the Court has concluded that summary judgment as to Brooks's excessive force claim is not appropriate as to Cronk, Elrod, Smurphat, and Spells, summary judgment as to Brooks's bystander claim stemming from their alleged use of excessive force would be similarly inappropriate. Nor is it appropriate as to Cronk, Noret, and Vargas as to Brooks's bystander-liability theory of deliberate indifference.

## 5.   Conclusion

The doctrine of qualified immunity aims to swiftly dispense with claims brought against officers exercising their best judgment. But it does not apply when a plaintiff has presented sufficient evidence that could lead a jury to find that the plaintiff's clearly established rights were violated. This opinion addresses only the defendants' ability to obtain a favorable outcome at this early juncture. It resolves nothing but the availability of that affirmative defense of qualified immunity, and it says nothing about the likelihood that Brooks will ultimately prevail. Here, Brooks has failed to carry his burden as to most of the

defendants, and they are entitled to summary judgment as a result.  The others must defend against Brooks's claims at trial.  A separate judgment will follow.

So ordered on September 29, 2021.

James Wesley Hendrix
United States District Judge