UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| CHANDLER BROOKS,<br><br>　　Plaintiff,<br><br>v.<br><br>TAYLOR COUNTY, et al.,<br><br>　　Defendants. | No. 1:20-CV-049-H |

## MEMORANDUM OPINION AND ORDER

This is the Court's second opinion addressing the issue of qualified immunity in this case. Officers Randall Farmer and Stan Meiser discovered an incoherent Chandler Brooks at the Motel 6 in Abilene, Texas, in March 2018. After Brooks failed to leave as instructed, he was arrested for trespassing and held at the Taylor County jail. Over the course of his incarceration, Brooks remained incoherent. After his release, it became clear that he had been assaulted in his motel room, sustaining a traumatic brain injury in the process.

Brooks sued the officers, his jailers, and a number of Taylor County officials, alleging that they ignored his need for medical attention. The officers moved for summary judgment on the basis of qualified immunity—a doctrine that shields officers unless they violated the plaintiff's then-clearly established rights. Brooks then dropped his claims against Meiser but maintains that Farmer was deliberately indifferent to his medical needs.

Considering the evidence in the light most favorable to Brooks, no clearly established law required Farmer to seek immediate medical attention in a situation like this. Nor was it objectively unreasonable for Farmer to decide not to seek medical attention at the scene. Farmer's motion for summary judgment as to qualified immunity is granted accordingly.

1.  **Factual & Procedural History**

The Court's prior opinions, Dkt. Nos. 64 & 78, explain in detail the factual and procedural history of this case. In short, Chandler Brooks was assaulted in a motel room in Abilene in March 2018. Officers were called to the motel by its management, who wanted Brooks removed from the property. Inside the room, Officer Farmer found Brooks in bed and incoherent. After numerous entreaties to leave on his own, Farmer and other officers removed Brooks from the room and placed him under arrest for trespassing. He was transported to the Taylor County jail where he remained incoherent for several days. Upon his release, he was diagnosed with a traumatic brain injury.

Brooks filed this suit against the arresting officers, his jailers, and various Taylor County and Abilene officials and entities. Count Six of Brooks's Second Amended Complaint (Dkt. No. 65 at 51–60) alleges that Officers Farmer and Meiser were deliberately indifferent to Brooks's medical needs. Count Eight (Dkt. No. 65 at 81–82) alleges bystander liability against both. The Court granted some of the jailers qualified immunity and denied it to others (Dkt. No. 78) and now turns to whether the arresting officers are entitled to qualified immunity.

Farmer and Meiser argue that neither was deliberately indifferent to Brooks's medical needs. Dkt. No. 72. In his response, Brooks writes that he is "no longer pursuing his claims against Defendant Meiser." Dkt. No. 80 at 8. And, since bystander liability turns on observing another's misconduct, Brooks "is no longer pursuing his claim for Bystander Liability against Defendant Farmer." *Id*. The only matter for the Court, then, is whether Officer Farmer is entitled to qualified immunity as to the deliberate-indifference claim against him. The Officers replied, Dkt. No. 83, so their motion is ripe.

2.  **Governing Law**

Section 1983 "provides a claim against anyone who 'under color of any ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983. Defendants who perform discretionary duties—such as police officers and jailers, *see, e.g.*, *id.* at 294—are entitled to invoke the judicially created doctrine of qualified immunity in response to a plaintiff's Section 1983 suit. Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). And, despite its name, where qualified immunity applies, it is absolute. So unless a defendant violates rights that are "clearly established," the plaintiff cannot recover under Section 1983.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation

marks and citations omitted).  This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S.731, 741 (2011).  In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

      The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).  Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments."  *Stanton v. Sims*, 571 U.S. 3, 6 (2013).  "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances."  *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)).  When a defendant invokes qualified immunity in his answer, the burden shifts to the plaintiff to demonstrate that the defense is unavailable.  *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

      Defeating an invocation of qualified immunity requires that the plaintiff "point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time."  *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (cleaned up).  "Summary judgment evidence" is evidence sufficient to support a verdict in the plaintiff's favor.  If,

– 4 –

however, "there is no genuine dispute as to any material fact," the defendants are entitled to judgment as a matter of law thanks to qualified immunity. Fed. R. Civ. P. 56(a). A plaintiff "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). And facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the Court must determine whether, after considering the evidence in the light most favorable to the nonmoving party (here, Brooks), a rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The Court may not weigh the evidence or evaluate the credibility of witnesses, *id.,* and any affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(c). So while the "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment," *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020), the plaintiff bears a heavy burden in overcoming a defendant's good-faith invocation of qualified immunity, *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

In sum, the Court's task is to review all of the evidence before it in the light most favorable to Brooks and ask, "Could a reasonable jury find that Farmer violated Brooks's clearly established rights?" If the answer is "no," then Farmer is entitled to summary

judgment on the basis of qualified immunity. If the answer is "yes," then Brooks's claim against him can proceed to trial.

**3.    Analysis**

The thrust of Brooks's claim against Officer Farmer is that he should have done more to investigate the cause of Brooks's incoherence at the time of his arrest. But because no reasonable jury could find that Farmer violated Brooks's clearly established rights, his claim must fail.

**A.    The Deliberate-Indifference Standard**

While a state may detain defendants for trial, its "exercise of its power to hold detainees and prisoners, however, brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being." *Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc). The Fourteenth Amendment guarantees arrestees the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials."[1] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, among others, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a

---

[1] In this regard, an arrestee is akin to a pretrial detainee. *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472–73 (5th Cir. 1996).

substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino*, 239 F.3d at 755).[2] The Fifth Circuit has consistently held that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (citing *Hare*, 74 F.3d at 645, 649); *see also, e.g.*, *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (clarifying that "mere disagreement with one's medical treatment is insufficient to show deliberate indifference"); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (explaining that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference") (citations omitted). Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to deliberate indifference. *Farmer*, 511 U.S. at 838.

Under exceptional circumstances, an "official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008) (citing *Farmer*, 511 U.S. at 842 & n.8). This exception has been applied in cases where the severity of the risk or injury is obvious or the cause of that injury or harm is plainly evident to the official. *See, e.g.*, *Easter v. Powell*, 467 F.3d 459, 463–64 (5th Cir. 2006) (holding that a prison nurse's subjective awareness was inferable where she was

---

[2] The Fifth Circuit observed in *Dyer* that some panels have articulated "a third element—that the official 'subjectively intended that harm occur.'" *Dyer*, 964 F.3d at 380 (quoting *Garza v. City of Donna*, 922 F.3d 626, 635 & n.5 (5th Cir. 2019)); *compare DeLaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (holding that deliberate indifference is present "only if the [official] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it") (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)), *with Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (holding that deliberate indifference also requires showing the official "subjectively intended that harm occur"). The officers note this third element in their brief (Dkt. No. 72 at 9), and Brooks objects in his response (Dkt. No. 80 at 39–40). The Court need not address the potential third element because the two-part inquiry resolves the issue. *See Dyer*, 964 F.3d at 380.

aware of the detainee's heart condition, and the detainee presented obvious signs of serious cardiac health risks); *see also Brannan v. City of Mesquite*, No. 3:19-CV-1263-X, 2020 WL 7344125, at *3–*4, *6 (N.D. Tex. Dec. 14, 2020); *Dyer*, 964 F.3d at 377–79, 385.  "[T]he plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs."  *Domino*, 239 F.3d at 756.

### B. Prong 1:  Was Farmer deliberately indifferent?

The best evidence before the Court is from Farmer's body-worn camera.³  The Court has watched the entirety of the recording from that day.  It has also watched all of Officer Meiser's bodycam footage from that day, and it has considered all of the evidence offered by the parties.⁴

The Court assumes, without deciding, *cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009), that there is a genuine dispute of material fact as to whether Farmer could draw an inference that Brooks needed medical attention.  Brooks's speech throughout the encounter was garbled.  Sometimes he would speak gibberish.  FV 29:10.  Other times he would clearly state "it hurts," say "please help," or unleash a parade of expletives at the officers.  FV 29:00.  It seems that Brooks suffered a black eye at the hands of his attackers—one of the jailers noted the injury at intake.  FV 1:13:20.  That injury likely would have been easily perceived by Farmer given his extensive interaction with Brooks.

---

³ The Court cites that footage as "FV" with a timestamp.  The footage was lodged as Exhibit B to the defendants' motion, *see* Dkt. No. 73 at 8–9, and delivered to the Court on a compact disc.  Meiser's footage was Exhibit D, Dkt. No. 73 at 12–13, and is cited as "MV".

⁴ Farmer objected to much of Brooks's evidence as inadmissible for one reason or another.  Dkt. No. 83 at 3–5.  The Court need not resolve those objections because Farmer prevails even if his objections are overruled.

Officers Hogue and Farmer identified what they believed to be blood on the floor of the motel room.  FV 6:35.  Farmer then inspected Brooks's wrists and body to look for signs of obvious injury; he found none.  FV 7:25.  The officers contacted supervisors and forensic officers to determine whether further investigation would need to take place given the blood on the floor.  From the bodycam footage, it is clear that the officers suspected that the blood came from someone other than Brooks.

At times Brooks became agitated and aggressive with Farmer and other officers, kicking and using expletives.  FV 28:40.  When he was offered pants and a shirt at the jail, he was unsteady as he donned them, but he knew how to dress himself—he understood how to put on pants and a shirt.  FV 1:20:00.  And while he was fingerprinted, Brooks remained up and on his feet continuously for roughly six minutes, though he was unsteady at times.  FV 1:14:10.  Brooks says that he "was holding his head the way someone would do if they were experiencing pain in their head."  Dkt. No. 80 at 13.  The evidence corroborates that statement: the bodycam footage shows Brooks frequently held his hand to his head, as if to cradle it.  *E.g.*, FV 10:10, 13:50, 21:50, 1:17:10.  But nothing about holding one's head is inconsistent with intoxication or its aftereffects.

Brooks makes much of the fact that he said at various points "please help" and "it hurts."  But those statements alone could not give Farmer notice that Brooks was experiencing brain trauma rather than intoxication.  Indeed, Brooks only began making those complaints once he had been detained.  Farmer may well have understood those complaints as related to the conditions of his detention—the discomfort of handcuffs, for example—rather than Brooks's own medical condition.  It is notable that Brooks's pleas for help ceased when he was uncuffed at the jail.  And, in any event, Brooks's pleas alone,

– 9 –

when coupled with the rest of the facts known to Farmer at the time, are insufficient to constitute a "wanton disregard" for Brooks's welfare.

The black eye, the blood on the floor and bed, and Brooks's incoherence all could plausibly lead one to conclude that medical assistance should be sought. This conclusion is reinforced by Farmer's training as an EMT. In short, there is evidence on both sides as to whether Brooks was injured or intoxicated.[5]

The Court also assumes, without deciding, that there is a genuine dispute of material fact as to whether Farmer actually drew the inference that Brooks needed medical assistance. When Meiser arrived, he asked if Brooks needed medical attention. FV 25:19. Farmer (as evidenced by Meiser's bodycam footage) shrugged and said that Brooks seemed okay—that he was incoherent but that there were no signs of injury. MV 3:05. Based on his ambiguous shrug in response to "Does he need medical?" and Farmer's later statements to Ms. Brooks about how he believed Brooks needed medical attention, Dkt. No. 81 at 21–22, a reasonable jury could find that Farmer was aware that Brooks needed help.

The Court also notes Farmer's conduct toward Brooks was, as much as any adversarial police-citizen encounter can be, marked by professionalism and respect. Farmer was calm, courteous, and as compassionate as an arresting officer could be. Farmer repeatedly pleads with Brooks, offers him his clothing, and inspects his body for injuries. FV 6:30, 7:20, 8:10, 11:00. Farmer did not raise his voice in anger until Brooks became physically aggressive. FV 29:00. Even when walking away from that confrontation, Farmer says nothing about Brooks, remarking only, "Good Lord." FV 29:45. The Fifth

---

[5] The Court uses "intoxicated" to mean under the influence of alcohol or drugs. The Court is aware that Farmer indicated that he did not believe Brooks was "intoxicated"—as in, drunk—at the jail.

Circuit has said that "an officer's demeanor is relevant to determining whether he subjectively disregarded a risk of serious harm." *Kelson v. Clark*, 1 F.4th 411, 420 (5th Cir. 2021). Here, Farmer's demeanor was exemplary.

Taking all of the evidence in the light most favorable to Brooks, the Court is skeptical that he has shown that Farmer was deliberately indifferent to his need for medical attention. "[A]n officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference." *Trevino v. Hinz*, 751 F. App'x 551, 555 (5th Cir. 2018). And "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Gobert*, 463 F.3d at 346. The Court need not resolve the issue, though, because Brooks's claim unquestionably fails the second prong of the qualified-immunity analysis.

### C. Prong 2: Did the law clearly prohibit Farmer's conduct at the time?

To defeat Farmer's motion for summary judgment on qualified immunity, Brooks must show that Farmer had fair warning that his decision to not call paramedics was a violation of Brooks's civil rights. And Brooks points to no on-point precedent establishing that what Farmer did was clearly unconstitutional.

Brooks's relies heavily on the Fifth Circuit's opinion in *Dyer v. Houston*, 964 F.3d 374 (2020). As Brooks notes, that opinion postdates the events here and therefore cannot serve as clearly established law. Even if it predated these events, *Dyer* is distinguishable along numerous axes. The facts of *Dyer* are disturbing and are worth reading in full. There, officers arrested eighteen-year-old Graham Dyer. As Judge Duncan wrote:

> While Heidelburg was driving, Graham screamed, thrashed violently, and slammed his head multiple times against the interior of the car. Heidelburg told Graham to stop hitting his head, but Graham did not comply. Heidelburg testified he pulled the car over to "[t]ry to stop

– 11 –

> [Graham] from hitting his head on the cage." Scott saw Heidelburg pull the car over and assumed he was doing so because Graham "was banging his head." The internal investigation report prepared by the Mesquite Police Department (based in part on a video recording of the incident) reported that Graham slammed his head against the "metal cage, side window and back seat" 19 times before Heidelburg pulled over.
>
> At that point, Scott stopped to help "prevent [Graham] from banging his head on the back of the car." Gafford also pulled over, seeking to help stop Graham from doing "further harm to himself." Gafford testified he could "actually see the car shaking from side to side" as Graham flung himself around in the back seat. When the car stopped, Graham continued to "scream and thrash," and the Officers tased him several times to regain control. After re-securing Graham, Heidelburg resumed driving toward the jail and Graham continued to scream and slam his head against the car's interior. According to the investigation report, Graham bashed his head another 27 times before they arrived at jail.
>
> All three Officers removed Graham from the patrol car and brought him into the sally port. Graham continued kicking and screaming as jail personnel tried to secure him. Graham was moved inside the jail, placed in a restraint chair, and eventually put in a padded cell. No evidence shows Graham caused any further harm to himself once restrained. The Officers each said they had no recollection of reporting to the jail sergeant the fact that Graham had slammed his head repeatedly against the interior of the patrol car en route to jail. The investigation report states only that the jail sergeant was "[i]nformed by transport officers [Graham] had been medically cleared at the scene."
>
> Just over two hours later, the sergeant noticed Graham's breathing was labored and summoned paramedics, who arrived at 1:40 a.m. Graham was transported to a local hospital and died at 11:00 p.m. that evening. Among other injuries, the autopsy reported extensive blunt force injuries to Graham's head and cranial hemorrhaging. The reported cause of death was craniocerebral trauma.

*Dyer*, 964 F.3d at 378–79.

The Fifth Circuit concluded that none of the officers were entitled to qualified immunity:

> A reasonable trier of fact could find that those Officers were aware that Graham, in the grip of a drug-induced psychosis, struck his head violently against the interior of Heidelburg's patrol car over 40 times en route to jail and thereby sustained severe head trauma. Both Officers told Graham to stop hitting his head and Heidelburg even pulled his

– 12 –

> patrol car over in an effort to stop him. Gafford acknowledged that, during his encounter with Graham, he knew "[t]here could be some inherent dangers" associated with head trauma; Heidelburg testified that what Graham was doing "certainly could" cause a head injury. Yet the Officers sought no medical care for Graham when they arrived at the jail. Nor did they alert jail officers (who had no way of knowing what had happened en route to the jail) of the possibility that Graham had seriously injured himself. The record instead reflects that the jail sergeant was "[i]nformed by [the] transport officers [that] Dyer had been medically cleared at the scene."

*Id*. at 381–82.

In denying qualified immunity, the Fifth Circuit relied on its decision in *Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2000), for the proposition that the officers were on notice that "having custody of a delusional detainee who was severely harming himself" and doing nothing to protect or help the detainee, despite "being aware of the detainee's dire condition," constituted deliberate indifference. *Dyer*, 964 F.3d at 834. In *Thompson*, a jailer was aware that the detainee "had elevated blood-alcohol content, was 'hallucinating,' and 'was injuring himself in his cell.'" *Dyer*, 964 F.3d at 384 (quoting *Thompson*, 245 F.3d at 452, 463). The Fifth Circuit highlighted in *Thomspon*, and again in *Dyer*, that the jailer in *Thompson* knew that the detainee had begun to injure himself by colliding with objects in his cell. *Id.* The *Thompson* jailer did—unlike the officers in *Dyer*—attempt to prevent or remediate the detainee's injuries. 245 F.3d at 453–54, 463. But the jailer then told her shift replacements not to summon medical help unless they got her approval and only if the detainee was "dying." *Id.* at 454. The detainee died shortly thereafter from *delirium tremens*. *Id.*

Brooks also cites *Brannan v. City of Mesquite*. No. 3:19-CV-1263-X, No. 2020 WL 7344125 (N.D. Tex. Dec. 14, 2020) (Starr, J.). There, officers witnessed a subject swallow a bag of suspected methamphetamine, then elected not to take her to the hospital for

evaluation. *Id.* at *1. She died a short time later of a methamphetamine overdose. *Id.* The officers were denied qualified immunity based on *Dyer* and *Thompson*. *Id.* at *6–*7.

This case is a far cry from all three. Farmer was not present at the time of Brooks's assault, and nothing indicates that Brooks was harming himself while he was restrained in the back of Farmer's car. In *Dyer*, the officers' presence at the time of the plaintiff's injury was indispensible to the Fifth Circuit's analysis: "[T]he Officers actually witnessed Graham violently slamming his head against the patrol car over and over again, inflicting the cerebral trauma that would kill him within about a day's time. And yet, instead of seeking medical assistance, the Officers deposited Graham at the jail, told jailers nothing about what Graham had done to himself en route, and informed the jail sergeant only that Graham 'had been medically cleared at the scene.'" *Dyer*, 964 F.3d at 384–85. "[T]heir behavior was deliberately indifferent to Graham's serious medical needs." *Id.* at 385.

*Thompson* is much the same. The officer there was aware that the detainee was extremely intoxicated, hallucinating, incoherent, injuring himself, and experiencing DTs. 245 F.3d at 463. Even though she placed the detainee under close observation and attempted to render aid, her decision not to seek medical help, in the face of the facts she knew about the detainee's condition, meant that she was not entitled to qualified immunity. *Id.* at 463–64. Here, by contrast, Farmer had only suppositions and a relatively brief encounter with a seemingly intoxicated detainee.

*Brannan* likewise involved officers who had concrete evidence of the detainee's medical condition. The officers there saw, with their own eyes, the detainee swallow a bag of what they almost certainly knew to be meth. Here, Farmer had no proof that Brooks was intoxicated—he was guessing, based on the totality of the circumstances and his experience.

Brooks says that Farmer's belief that Brooks was intoxicated makes *Brannan* analogous. Dkt. No. 80 at 43.  But Brooks's own excerpt also shows why *Brannan*—a district court case that cannot "clearly establish" the law for officers—does little work for him.  There, the officer was "aware that [the plaintiff] used methamphetamine and believed she had swallowed narcotics."  Dkt. No. 80 at 44.  The *Brannan* officers "believed" that their detainee swallowed methamphetamine because they saw her do it.  Moreover, unlike the *Brannan* officers, Farmer did not know Brooks's name, let alone his history of drug use.

Further underscoring the importance of an officer's witnessing the harmful behavior, the paramedics in *Dyer*—who examined the detainee before he was placed into the patrol car—were entitled to qualified immunity on the deliberate-indifference claims against them. 964 F.3d at 380–81.  So too were the paramedics who examined the detainee in *Brannan*. 2020 WL 7344125, at *5.  And other officers in *Brannan* who booked that detainee into jail were entitled to qualified immunity because they were not aware of what she had swallowed.  *Id*. at *8 & n. 76.  Here, Farmer did not know what was wrong with Brooks— only that something was off.  Farmer's conduct here comes nowhere close to the deliberate indifference exhibited by the officers in *Dyer*, *Thompson*, or *Brannan*, who saw someone in their care and custody put their life in jeopardy and did nothing in response.

Nor is this a case like *Kelson v. Clark*, 1 F.4th 411 (5th Cir. 2021), cited by neither party.  There, Dallas officers were alerted to a homeless man who had been assaulted, resulting in visible injuries and bleeding.  Rather than help the man—who told the officers that he had been beaten and sustained a head injury as a result—the officers mocked him, taunted him, then arrested him for public intoxication.  He was discovered dead in a holding cell the next morning, killed by injuries that never received the medical attention he

– 15 –

asked for.  *Id*. at 414–15.  None of the officers were entitled to qualified immunity.  *Id*. at 421.  Far from a situation in which an officer "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs," *id.* (cleaned up), Farmer's conduct evinced a genuine concern for Brooks's wellbeing.

*Tamez v. Manthey*, 589 F.3d 764 (5th Cir. 2009), is the most analogous case, and it is firmly in Farmer's column.  There, the Fifth Circuit concluded that the officers were not deliberately indifferent when they had no reason to know that their detainee had recently swallowed a bag of cocaine, and the only symptom of his intoxication was dilated pupils.  Dilated pupils can "mean 'a lot of things.'"  *Id*. at 771.  The same is true for slurred speech and reported head pain.  Farmer knew that Brooks was exhibiting symptoms of some sort of neurological impairment, but his symptoms could have been explained just as well by intoxication as traumatic brain injury.  *See McWilliams v. City of Houston*, No. 4:17-CV-345, 2021 WL 2445878, at *9–*10 (S.D. Tex. June 15, 2021) (Eskridge, J.) ("Plaintiffs allege throughout only variations on the allegation that Stephen appeared to be heavily intoxicated, as he was incoherent and unable to stand. . . . But there's no allegation that [the detainee] informed anyone of such ingestion, that he was in observable medical distress because of it, or that the HCJ Defendants were affirmatively aware that Stephen was at some point suffering from cocaine toxicity.").

Other cases also demonstrate that there is no clearly established law that would have warned Farmer that his failure to call paramedics constituted deliberate indifference.  Consider the differences between this case and *Sims v. City of Jasper*.  543 F. Supp. 3d 428 (E.D. Tex. 2021).  There, arresting officers were intimately familiar with the detainee's

history of drug use and recent medical history, and they were present for the majority of the detainee's ultimately fatal incarceration. *Id.* at 434–38, 440–42. Here, Farmer did not know Brooks's name, let alone his medical history, and left the jail shortly after Brooks was booked in. Consider, too, *Wagner v. Bay City, Texas*, 227 F.3d 316 (5th Cir. 2000). Officers in that case pepper sprayed an arrestee and placed him in the back of a patrol car. *Id.* at 318–19. After they arrived at the jail, the officers discovered that he had stopped breathing; they immediately began CPR. *Id.* at 319. All were entitled to qualified immunity. *Id.* at 325–26. And, as in *Arshrad*, Brooks was able to breathe and walk. *Ashrad ex rel. Ashrad v. Congemi*, No. 08-30061, 2009 WL 585633, at *1, *7 (5th Cir. 2009). Officers there were entitled to qualified immunity after their detainee died of an unknown heart condition in the back of a patrol car. *Id.* at *1–*2, *7. Here, Brooks's speech was generally incoherent but at times ventured into lucidity, mostly in the form of "it hurts" or various expletives. Finally, like in *Simmons*, where officers were unaware that their detainee was suffering from a subdural hematoma and thus entitled to qualified immunity, Farmer had no actual knowledge of the intracranial pressure that was building in Brooks's head. *Simmons v. City of Columbus*, 425 F. App'x 282, 283–84 (5th Cir. 2011).

In short, Brooks can point to no analogous precedential case that could have given Farmer notice that his decision not to call for medical attention was a violation of Brooks's civil rights. Caselaw clearly requires law enforcement to call for help in certain situations; no case that Brooks identifies or that the Court has found says that the circumstances of Brooks's arrest is one of them.

And even if there were some precedent that bound Farmer to call for medical attention in circumstances like these, Farmer would still be entitled to qualified immunity

because his decision not to seek medical attention was objectively reasonable. "If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)). Viewing the facts in the light most favorable to Brooks, Farmer's actions in choosing to take Brooks to jail—rather than call for paramedics—was objectively reasonable. *Id.* ("Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury.").

The Fifth Circuit has held that it is objectively reasonable for officers to let an intoxicated inmate "sleep it off," so long as the detainee is monitored. *Estate of Allison v. Wansley*, 524 F. App'x 963, 972 (5th Cir. 2013). The alternative rule—Brooks's rule—would require that officers summon paramedics anytime they encounter someone who may be under the influence of drugs or alcohol. As the Fifth Circuit recognized, the Constitution makes no such demand:

> "To accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take." *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). While the result here was tragic, we cannot say that all, or even most, reasonable officers would not have done the same, absent an inmate's additional external manifestations of medical distress.

*Estate of Allison*, 524 F. App'x at 972–73. So too here.

4. **Conclusion**

What happened to Chandler Brooks in March 2018 should not have happened. His friend, Gavin Gibson, should have called for help when he knew Brooks was hurt. Once

jailed, he should have received treatment. While it remains to be seen whether the remaining defendants are legally responsible for the injuries Brooks suffered, no reasonable jury could conclude that Officer Farmer violated Brooks's clearly established rights. Thus, his motion for summary judgment (Dkt. No. 71) is granted. And because Brooks has dropped his claims against Officer Meiser entirely, he is entitled to summary judgment, too.

So ordered on March 18, 2022.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE